## UNITED STATES *v.* ARIZONA.

No. 18, original. Argued March 4, 1935.—Decided April 29, 1935.

*Assistant Attorney General Blair,* with whom *Solicitor General Biggs* and *Mr. David B. Hempstead* were on the brief, for the United States.

178

*Mr. James R. Moore*, Special Assistant Attorney General of Arizona, with whom *Mr. John L. Sullivan*, Attorney General, and *Mr. Herman Lewkowitz* were on the brief, for Arizona.

Mr. Justice Butler delivered the opinion of the Court.

September 10, 1934, the United States, acting through Harold L. Ickes, Secretary of the Interior and Federal Emergency Administrator of Public Works, caused to be commenced the construction of the Parker Dam in the main stream of the Colorado River, the thread of which for a distance of about 237 miles is the boundary between Arizona and California. The site is 150 miles below the Boulder Dam, half a mile below the place where the Williams River flows into the Colorado, and 10 miles north of the Colorado River Indian Reservation. Its ends rest on public lands of the United States in Arizona and California. Arizona objects to the construction of the dam, asserts that it may not lawfully be built without her consent, and threatens the use of military force to stop the work. January 14, 1935, the United States filed its bill in equity perpetually to enjoin interference by the State. On plaintiff's motion this court directed defendant to show cause why a restraining order should not issue pending the final determination of the suit. Arizona filed a return consisting of an affidavit of the Governor setting forth the grounds on which the State claims the right to prevent the construction of the dam in the part of the river bed that is easterly of the thread of the stream, a motion to dismiss the bill, and a supporting brief. We heard counsel on plaintiff's application for a temporary injunction and defendant's motion to dismiss.

We come first to the question whether the complaint alleges facts sufficient to warrant an injunction against the State. The allegations will be better understood after brief reference to the Colorado River Compact [1] and the Boulder Canyon Project Act, 45 Stat. 1057.

The Compact was made by California, Colorado, Nevada, New Mexico, Utah and Wyoming. Arizona was

---

[1] Printed in California Statutes, 1929, c. 1, § 1.

not a party. It was made to provide an equitable apportionment of the waters of the Colorado River system among the interested States, establish relative importance of different beneficial uses and secure the development of the Colorado River basin, the storage of its waters and protection against floods. After apportionment between defined basins lying above and below Lee Ferry and a declaration that the Colorado has ceased to be navigable for commerce and that the use of its waters for purposes of navigation should be subservient to uses for domestic, agricultural and power purposes, the Compact authorizes the waters of the system to be impounded and used for the generation of power and declares that use subservient to uses for agricultural and domestic purposes. It was approved by § 13 (a) of the Boulder Canyon Project Act and, by presidential proclamation, it took effect June 25, 1929. 46 Stat. 3000. The Act authorizes the Secretary of the Interior to construct a dam and incidental works in the Colorado at Boulder Canyon adequate to create a reservoir having a capacity of not less than 20,000,000 acre feet "and a main canal and appurtenant structures located entirely within the United States connecting the Laguna Dam, or other suitable diversion dam, which the Secretary . . . is hereby authorized to construct if deemed necessary or advisable by him upon engineering or economic considerations, with the Imperial and Coachella Valleys in California." § 1.[2] In a suit in this Court against the Secretary of the Interior and the States which were parties, Arizona unsuccessfully sought to have ratification of the Compact decreed to be unconstitutional and to enjoin construction of the Boulder Dam and the doing

---

[2] By §§ 12 and 14 of the Boulder Canyon Project Act, the Reclamation Law is defined to mean the Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof and supplemental thereto, including the Boulder Canyon Project Act.

of anything under color of that Act. *Arizona* v. *California*, 283 U. S. 423.

The bill alleges that February 10, 1933, the United States, acting through the Secretary of the Interior, entered into a contract with the Metropolitan Water District of Southern California. The District agrees to pay to the United States the entire cost of the dam, assumed not to exceed $13,000,000. By the use of this money the United States agrees that, under the Reclamation Act, June 17, 1902, 32 Stat. 388, and supplemental Acts, particularly those of April 21, 1904, 33 Stat. 224, March 4, 1921, 41 Stat. 1404, and December 21, 1928 (The Boulder Canyon Project Act)[3] it will construct the Parker Dam. The District is to have one-half the power privilege and the right to divert specified quantities of water. The United States is to have the right to the rest of the power, to divert water, to transmit power at cost over the District's lines from Boulder to Parker, and, by means of canals, to connect Parker Dam with lands in the Colorado River Indian Reservation in Arizona and with other lands in that State and in California.

Parker Dam will intercept waters discharged at Boulder Dam and the inflow of tributaries of the Colorado below that dam; raise the river level 72 feet and create a reservoir about 20 miles long, having capacity of 717,000 acre feet, and permit generation of approximately 85,000 horse-power of electricity. Operated with Boulder Dam, it will

---

[3] Other amendatory and supplemental acts are: Acts of February 25, 1905, 33 Stat. 814; March 3, 1905, 33 Stat. 1032; April 16, 1906, 34 Stat. 116; June 12, 1906, 34 Stat. 259; June 27, 1906, 34 Stat. 519; June 11, 1910, 36 Stat. 465; June 25, 1910, 36 Stat. 835; February 21, 1911, 36 Stat. 925; February 24, 1911, 36 Stat. 930; August 13, 1914, 38 Stat. 686; June 12, 1917, 40 Stat. 149; October 2, 1917, § 10, 40 Stat. 300; February 25, 1920, § 35, 41 Stat. 450; May 20, 1920, 41 Stat. 605; June 10, 1920, § 17, 41 Stat. 1072; December 5, 1924, § 4, 43 Stat. 701; June 6, 1930, 46 Stat. 522.

"reregulate and equate, in aid of navigation and river regulation," the waters discharged at Boulder Dam for flood control, power generation and irrigation; allow, for generation of power, the discharge at Boulder Dam of water which otherwise would have to be retained there in storage and also conserve the waters there discharged.

The bill also alleges that heavy flash floods of the Williams River are a menace to the Colorado River Indian Reservation, to United States public lands and to navigation below Parker. The dam is designed to promote reclamation of the reservation lands and of public lands of the United States. The power privilege reserved by the United States is for the purpose of pumping water for irrigation of these lands.

To disclose grounds on which the United States claims the right to construct the dam, the bill sets out that at various times Congress has made appropriations amounting in all to more than $1,359,000 for construction of irrigation and diversion works for the reservation;[4] that the above mentioned Act of April 21, 1904, authorized the Secretary of the Interior to divert the waters of the Colo-

---

[4] Act of March 2, 1867, 14 Stat. 514, appropriated $50,000 "For expense of collecting and locating the Colorado River Indians in Arizona, on a reservation set apart for them by " § 1, Act of March 3, 1865, 13 Stat. 559, " including the expense of constructing a canal for irrigating said reservation." For completing the canal, $50,000 was appropriated by the Act of July 27, 1868, 15 Stat. 222, and $20,000 by the Act of May 29, 1872, 17 Stat. 188.

Section 3, Act of April 4, 1910, 36 Stat. 273, appropriated $50,000 " For the construction of a pumping plant to be used for irrigation purposes on the Colorado River Reservation, together with the necessary canals and laterals, for the utilization of water in connection therewith, for the purpose of securing an appropriation of water for the irrigation of approximately one hundred and fifty thousand acres of land . . . to be reimbursed from the sale of the surplus lands of the reservation." To complete and maintain the work commenced by the 1910 Act, Congress has since appropriated $888,710.

rado and to reclaim, utilize and dispose of land in the reservation which might be made irrigable by works constructed under the Reclamation Act, and that the Boulder Canyon Project Act appropriated moneys for surveys of the Parker-Gila reclamation project, which, it is said, embraces the Indian reservation and certain public lands of the United States. And it is asserted that the Parker Dam project has been included by the Administrator in the comprehensive program of public works authorized by § 202, National Industrial Recovery Act, 48 Stat. 201; that, pursuant to that Act, the Chief of Engineers of the United States Army has recommended the construction and his recommendation has received the approval of the Secretary of War.

1. The bill alleges that the stretch of the Colorado between Arizona and California is navigable, and the motion to dismiss is dealt with on that basis. Arizona owns the part of the river bed that is east of the thread of the stream. *New Jersey* v. *Delaware,* 291 U. S. 361, 379 *et seq.* Her jurisdiction in respect of the appropriation, use and distribution of an equitable share of the waters flowing therein is unaffected by the Compact or federal reclamation law. But the title of the State is held subject to the power granted to Congress by the commerce clause, *United States* v. *Holt State Bank,* 270 U. S. 49, 54–55, and under that clause Congress has power to cause to be built a dam across the river in aid of navigation. The Boulder Canyon Project Act is an example of the exertion of that power. *Arizona* v. *California, supra,* 451, 455–457. But no Act of Congress specifically authorizes the construction of the Parker Dam. Subject to an exception with which we have no concern, § 9 of the Act of March 3, 1899, forbids the construction of any bridge, dam, dike or causeway over or in any port, roadstead, haven, harbor, canal, navigable river or other navigable water of the United States until the consent of Congress shall have

been obtained and until the plans shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War. 33 U. S. C., § 401. And § 12 makes violations of § 9 punishable by fine or imprisonment or both and provides for the removal of unauthorized structures. 33 U. S. C., § 406. These provisions unmistakably disclose definite intention on the part of Congress effectively to safeguard rivers and other navigable waters against the unauthorized erection therein of dams or other structures for any purpose whatsoever. The plaintiff maintains that the restrictions so imposed apply only to work undertaken by private parties. But no such intention is expressed, and we are of opinion that none is implied. The measures adopted for the enforcement of the prescribed rule are in general terms and purport to be applicable to all. No valid reason has been or can be suggested why they should apply to private persons and not to federal and state officers. There is no presumption that regulatory and disciplinary measures do not extend to such officers. Taken at face value the language indicates the purpose of Congress to govern conduct of its own officers and employees as well as that of others. *Donnelley* v. *United States,* 276 U. S. 505, 516. If still in force, § 9 unquestionably makes "consent of Congress" essential to the valid authorization of the Parker Dam. There has been no express repeal of that section and, as will presently appear, it is not inconsistent with subsequent legislation on which plaintiff relies.

2. Plaintiff, unable to cite any statute specifically authorizing the Secretary to construct the dam, turns to § 25 of the Act of April 21, 1904, 33 Stat. 224. That section is a part of the reclamation laws which are enacted—not under the commerce clause, Art. I, § 8, cl. 3, but in the exertion of power granted by Art. IV, § 3, cl. 2: " The Congress shall have Power to dispose of and make all

needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *United States* v. *Hanson*, 167 Fed. 881, 883. *Kansas* v. *Colorado*, 206 U. S. 46, 88, *et seq.* The part of § 25 relied on follows: " That in carrying out any irrigation enterprise which may be undertaken under the provisions of the reclamation Act . . . and which may make possible and provide for, in connection with the reclamation of other lands, the reclamation of all or any portion of the irrigable lands on the Yuma and Colorado River Indian Reservations in California and Arizona, *the Secretary of the Interior is hereby authorized to divert the waters of the Colorado River* and to reclaim, utilize, and dispose of any lands in said reservations which may be irrigable by such works in like manner as though the same were a part of the public domain." The immediate question is whether the italicized clause can reasonably be construed as adequate to carry the burden that plaintiff would have us lay upon it. The purpose was not to prescribe or regulate the means to be employed to divert water from the Colorado but to extend the reclamation law to the Indian reservations named. It was merely to empower the Secretary, if the circumstances stated should arise, to reclaim lands in these reservations by use of water to be taken from that river. The authority granted was no more than permission to appropriate them for the purpose specified. No dam is shown to have been necessary. Water is frequently taken from streams for the purposes of irrigation without putting dams across them. Failure specifically to authorize a dam or even approximately to fix location or to require use calculated to aid navigation makes strongly against the plaintiff.

In support of the construction for which it contends, plaintiff asserts that it was under this Act that the Secretary of the Interior built the Laguna Dam across the

Colorado. But it does not appear that either riparian State objected or that the validity of his authority has ever been drawn in question. Congress has made appropriations for the benefit of the project of which it is a part [5] and so recognized and approved the building of the dam. *Wisconsin* v. *Duluth*, 96 U. S. 379, 386. There has been cited no other instance of the construction, without the consent of the Congress, of a dam across a navigable interstate river. Indeed, it is not certain that that part of the Colorado was then deemed to be navigable.[6] We find no merit in the contention that § 25 of the Act of April 21, 1904, is the "consent of Congress" required by § 9 of the Act of March 3, 1899. And plainly without force is the suggestion that by making appropriations for irrigation of lands in Indian reservations Congress authorized this dam.

3. The clause of § 1 of the Boulder Canyon Project Act empowering the Secretary to construct a main canal connecting the Laguna Dam "or other suitable diversion dam" with the Imperial and Coachella Valleys does not authorize the building or in any respect apply to the proposed Parker Dam. The latter is about 70 miles upstream from the Laguna and the canal proposed to be built to bring water to the valleys named.[7] The contract alleged to have been made by the United States and the Metropolitan Water District, a copy of which is attached to plaintiff's brief, shows that the purpose immediately to be served by the Parker Dam is to enable the United

---

[5] See e. g., Acts of July 1, 1916, 39 Stat. 304; June 12, 1917, 40 Stat. 148, and July 1, 1918, 40 Stat. 674, making appropriations for the Yuma Project, Arizona-California, which includes the Laguna Dam. See e. g., Reclamation Service Report 13, p. 73, *et seq.;* Report 15, p. 68, *et seq.*

[6] See Art. IV (a), Colorado River Compact.

[7] Wilbur and Ely, The Hoover Dam Contracts, United States Department of the Interior, 1933, pp. II, 71, 325.

States in fulfillment of earlier contracts to deliver waters at that place into the aqueduct of the District. And while that instrument specifies other uses to which the United States may put the waters by means of the dam, transmission by canal to either of these valleys is not mentioned. Indeed, the plaintiff does not, and it could not reasonably, claim that § 1 of the Boulder Canyon Project Act authorizes the construction of this dam. Nor does it make any contention in respect of the allegation of the bill that § 11 of the Act authorizes surveys of the Parker-Gila reclamation project.

4. Parker Dam was not approved by the President as required by § 4 of the Act of June 25, 1910, 43 U. S. C., § 413. That section declares that no irrigation project contemplated by the Reclamation Act " shall be begun unless and until the same shall have been recommended by the Secretary of the Interior and approved by the direct order of the President of the United States." The project in question rightly may be deemed to have been begun on the date, February 10, 1933, of the contract made by the United States and the Water District for the construction of the dam. There is no allegation that any project including the dam was ever recommended, submitted to or in any manner approved by the President. But plaintiff maintains that the approval required in the section has been given through executive action under the National Industrial Recovery Act. It relies on §§ 201 a, 202 and 203 of the Act and Executive Order No. 6252. The first of these authorizes the President to delegate any of his powers under Title II of the Act to such agents as he may designate. Section 202 provides that the Administrator under the direction of the President shall prepare a comprehensive program of public works " which shall include . . . construction of river and harbor improvements . . . *Provided,* That no river or harbor improvements shall be carried out unless they shall have heretofore

or hereafter been adopted by the Congress or are recommended by the Chief of Engineers . . ." Section 203 authorizes the President "through the Administrator . . . to construct . . . any public-works project included in the program prepared pursuant to section 202." The Executive Order delegates authority to the Administrator " to construct . . . any public-works project included in the program." The contract here involved was made more than four months before the passage of that Act. Plaintiff asserts that the project was included in the comprehensive program, that the Administrator commenced construction about September 10, 1934, and that on November 10 following, Arizona interfered forcibly to prevent plaintiff from doing the work. The alleged recommendation by the Chief of Engineers and approval by the Secretary of War were not made until January 5, 1935,[8] nine days before plaintiff filed its bill. These facts do not constitute approval " by direct order of the President " as required by § 4. Plaintiff does not allege or claim that the President has directly authorized the dam or specifically empowered the Administrator to include it in the comprehensive program. We find nothing in the Recovery Act that reasonably may be held to repeal the requirement of that section. It follows that the construction of the dam has not been authorized as required by the Reclamation Law.

5. Plaintiff's contention that the dam is being built under authority of the Recovery Act is without force.

The chronology just given, when taken in connection with the citations in the contract of the Acts relied on, shows the claim to be an afterthought born of the contro-

---

[8] The complaint does not show the date of the alleged inclusion of the dam in the comprehensive program of public works authorized by § 202 of the Recovery Act. It also fails to give the date of the recommendation of the Chief of Engineers and appoval by the Secretary of War. A copy of the certificate attached to the complaint furnishes that date, January 5, 1935.

versy disclosed by the complaint and about to be here submitted. Section 25 of the Act of April 21, 1904, does not authorize this dam. Plaintiff does not assert that it was otherwise adopted by Congress. It therefore remains only to consider whether the dam was recommended by the Chief of Engineers within the meaning of the proviso of § 202. When the Recovery Act was passed, the phrases "adopted by the Congress" and "recommended by the Chief of Engineers," when used in Acts of Congress relating to river and harbor improvements, had well-understood and definite technical meanings. The statutes, at least in the 40 years next preceding the passage of the Recovery Act, disclose: It has been the general, if not indeed the uniform, practice of Congress specifically to authorize all river and harbor improvements carried out by the United States,[9] and to base its action upon the recommendation of the Chief of Engineers.[10] That officer

---

[9] The Rivers and Harbors Acts prior to that of September 22, 1922, authorized surveys and improvements and made appropriations. A typical provision was: "That the following sums . . . are hereby appropriated . . . to be expended under the direction of the Secretary of War and the supervision of the Chief of Engineers, for the construction, completion, repair, and preservation of the public works hereinafter named. . . ." Act of August 8, 1917, 40 Stat. 250. The Act of September 22, 1922; omitted appropriations and adopted specified improvements: "That the following works of improvement are hereby adopted and authorized, to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers in accordance with the plans recommended in the reports hereinafter designated. . . ." 42 Stat. 1038. The same language is used in § 1 of the Acts of March 3, 1925, 43 Stat. 1186; January 21, 1927, 44 Stat. 1010, and July 3, 1930, 46 Stat. 918. See also 79 Cong. Rec. p. 5454.

[10] ". . . The Committee on Rivers and Harbors has pursued an invariable rule of requiring all rivers and harbors projects to have the approval and recommendation of the Corps and Chief of Engineers before we considered them eligible for consideration." Remarks of chairman of that committee in the Committee of the Whole House

makes such recommendation only after preliminary examinations followed by surveys.[11]  Congress expressly directs the making of these examinations and surveys [12] and prohibits any which it has not authorized.[18]

considering bill for river and harbor improvements, 79 Cong. Rec., p. 5441, see also pp. 5460, 5465, 5466.  Cf. § 9, Act of September 22, 1922 (33 U. S. C., § 568) : " No project shall be considered by any committee of Congress with a view to its adoption, except with a view to a survey, if five years have elapsed since a report upon a survey of such project has been submitted to Congress pursuant to law."

[11] To secure greater uniformity in the recommendations and reports required of Chief of Engineers (See H. Rep. No. 795, 57th Cong., 1st session, p. 3), Congress created in his office a Board of Engineers for Rivers and Harbors, § 3, Act of June 13, 1902, 32 Stat. 372.  Subsequent legislation in respect of this Board, material here, is found in § 3, Act of June 25, 1910, 36 Stat. 668; §§ 3 and 4, Act of March 4, 1913, 37 Stat. 825; § 2, June 5, 1920, 41 Stat. 1010; § 9, September 22, 1922, 42 Stat. 1043.  33 U. S. C., §§ 541, 542, 545, 546, 547, 568.

Preliminary examinations are first made, unless Congress expressly directs a survey and estimate, and if, upon such examination, the improvement is not thought advisable, no further action may be taken unless Congress so directs.  33 U. S. C., § 545.  The subsequent detailed survey report is made by the district engineer, it is reviewed by the division engineer, by the Board of Engineers for Rivers and Harbors and finally by the Chief of Engineers who submits to Congress a report containing information of a character specified by the above statutes, together with his recommendation.  As shown in footnote 10, a congressional committee may not consider a project with a view to its adoption if five years have elapsed since submission of a report on a survey.  See 79 Cong. Rec., p. 5439, et seq.  1922 Report of Chief of Engineers, pp. 99, 100.

[12] Since September 22, 1922, the Acts authorizing preliminary examinations and surveys employ the following language: " The Secretary of War is hereby authorized and directed to cause preliminary examinations and surveys to be made at the following-named localities. . . ."  § 12, 42 Stat. 1043.

[18] " That no preliminary examination, survey, project, or estimate for new works other than those designated in this or some prior Act

"As a general rule, where the legislation dealing with a particular subject consists of a system of related general provisions indicative of a settled policy, new enactments of a fragmentary nature on that subject are to be taken as intended to fit into the existing system and to be carried into effect conformably to it, excepting as a different purpose is clearly shown." *United States* v. *Jefferson Electric Co.*, 291 U. S. 386, 396. In the light of that rule it is clear the general language of the Recovery Act on which plaintiff relies does not evidence intention on the part of Congress to change its well established policy. In respect of the required recommendation by the Chief of Engineers there is no inconsistency between the proviso and the statutes upon which rests the practice of his office. The Recovery Act may, and therefore it must, be read in harmony with the purposes evidenced by the provisions of the Rivers and Harbors Acts to which reference has been made. When so read the proviso requires that the recommendation of the Chief of Engineers be based on examinations, surveys and reports made in pursuance of these Acts and submitted to the Congress for its consideration when determining whether the project should be undertaken. The only change effected by the Recovery Act is that the improvement may be made if either "adopted by the Congress" or "recommended by the Chief of Engineers" whereas the prior practice required not only recommendation by the Chief of Engineers but also adoption by Congress; that is, the Recovery Act amounts merely to the adoption of projects that have been here-

or joint resolution shall be made." § 12, Act of September 22, 1922, 42 Stat. 1043. Typical language in the Acts appropriating for rivers and harbors is: " That no funds shall be expended for any preliminary examination, survey, project, or estimate not authorized by law." It is found, for example, in the Act of April 26, 1934, 48 Stat. 639–640, making appropriations for the fiscal year ending June 30, 1935.

tofore or hereafter may be recommended to Congress by the Chief of Engineers under the established practice.[14]

In accordance with definite policy long pursued by it, the Congress has committed to the Secretary of War and Chief of Engineers all investigations, surveys and work in aid of navigation. The Recovery Act discloses no intention to require that the Chief of Engineers' recommendations in respect of proposed improvements shall be made to the Administrator instead of to the Congress. The provisions of the Act brought forward by plaintiff make no such change. Plainly they are not sufficient to empower the Administrator to initiate preliminary examinations and surveys or to determine whether the Parker Dam or any work in aid of navigation shall be undertaken.

It is not shown that Congress ever directed a preliminary examination or survey by the Chief of Engineers of any project that includes this dam. This is a condition precedent to the recommendation required by the proviso. Failure to allege compliance warrants the conclusion that the recommendation relied upon lacks the support of examination and survey by army officers and review by the board of engineer officers required by law.

6. As the complaint fails to show that the construction of the dam is authorized, there is no ground for the granting of an injunction against the State, and therefore the complaint must be

*Dismissed.*

---

[14] When the Recovery Act was enacted, Congress had before it the report of the Chief of Engineers for the fiscal year ended June 30, 1932. This report disclosed (p. 3) that 954 projects authorized by Congress were in force, that active operations were in progress upon 361 (p. 4), that reports on 242 preliminary examinations and surveys had been transmitted to Congress during the past fiscal year (p. 6), and that the Chief of Engineers had under consideration 302 investigations authorized by river and harbor and flood control acts. (p. 22.)