### JEFFERSON v. UNITED STATES.

#### Civ. No. 3692.

District Court, D. Maryland.

May 7, 1948.

Tydings, Sauerwein, Archer, Benson & Boyd, Morris Rosenberg and Robert H. Archer, Jr., all of Baltimore, Md., for plaintiff.

Bernard J. Flynn, U. S. Atty., and James B. Murphy, Asst. U. S. Atty., both of Baltimore, Md., for defendant.

CHESNUT, District Judge.

This is a suit under the recently enacted Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq. The plaintiff who had been an aviation mechanic at the Glenn L. Martin Company's plant in Baltimore, enlisted in the United States Army October 22, 1942. On July 3, 1945 while still in the Army he underwent an abdominal operation for gall bladder trouble at Fort Belvoir, Virginia, a Government Hospital. The operation was performed by a United States Army medical officer who was the chief surgeon at the hospital at the time. The complaint in this case is that a large towel, 30 inches long by 18 inches wide, was negligently left in the plaintiff's abdomen during the operation and remained there until it was discovered during a subsequent abdominal operation performed at the Johns Hopkins Hospital in Baltimore on March 13, 1946. He alleges total and permanent disability as a result of this alleged negligence.

The complaint was filed July 31, 1947. The defendant filed a motion to dismiss on the grounds that the Federal Tort Claims Act did not cover a case of this kind. After extended hearing on the motion it was overruled *without prejudice*, October 29, 1947. D.C., 74 F.Supp. 209. Subsequently the defendant has filed an answer and amended answers and the case has been heard upon testimony and arguments of counsel. The evidence establishes the following briefly summarized facts.

1. When the plaintiff first enlisted in the Army he was 45 years of age. He had previously had an abdominal operation for appendicitis from which he had apparently completely recovered. About five months after enlisting and while in the Army he had an abdominal operation at an Army hospital at Indiantown Gap, Pennsylvania, during which one of his kidneys was removed. After several weeks in the hospital he returned to service and was given somewhat lighter work at various aviation fields as a flight chief. From January 19 to May 17, 1943, he had various medical complaints diagnosed as hydronephrosis and a subsequent diagnosis of herpes of the lower lip reported cured on February 7, 1943; but on February 19, 1943 a further diagnosis indicated pleurisy, reported cured on March 3, 1943. From February to April 1945 he had an ill defined condition of the gastrointestinal system including vomiting, with non-functioning gall bladder and an absence of the right kidney which had been removed on March 5, 1943. From April 24 to November 20, 1945 he had cholecystitis. The operation on July 3, 1945, made the basis of the complaint in this case, was for cholecystostomy. During the earlier portion of this period he was at Edgewood, Maryland, suffering from jaundice for two or three months until he was sent to Fort Belvoir, Virginia.

2. The plaintiff is a naturalized citizen, a native of Denmark. He was honorably discharged from the Army on January 9, 1946. On March 8, 1946 he went to the Johns Hopkins Hospital in Baltimore for treatment (because of vomiting spells and nausea which had commenced about two weeks prior to admission and grown increasingly more severe). On March 13, 1946 he was operated upon by Dr. Grose

who had graduated at Johns Hopkins University Medical School some years previously, had been an interne there in the surgical department for a year or so; had served for two or three years in the Hopkins Medical Unit in the South Pacific, and had then returned to Hopkins for a while and at the particular time was engaged in private surgical practice.

3. Dr. Grose found a well healed medical scar on the front abdomen of the plaintiff through which he again operated and as a result of the operation found a towel in the lower part of the plaintiff's stomach which had partly worked into the duodenum. This towel was removed, measured and photographed. It bore the legend "Medical Department U. S. Army". It was 2½ feet long by 1½ feet wide. Dr. Grose also found the condition and relation of the plaintiff's stomach and intestines to each other was such as to indicate very clearly that there had been a previous operation on the plaintiff for gastrojejunostomy which, in Dr. Grose's opinion, meant an opening of the stomach. The doctor expressed the opinion that there were three possibilities as to how the towel could have gotten into the plaintiff's stomach. First (theoretical largely) that it had been swallowed by the plaintiff; second, that it had been left in the plaintiff's abdomen during a surgical operation which must have occurred some months before, which, if it did not involve an opening of the stomach and placing of the towel therein, had resulted in the towel working its way through the walls of the stomach into the stomach itself (and then partially back into the duodenum). While this was a possibility by reason of some few prior recorded cases of a similar nature, such a happening would be very rare indeed; third the remaining possibility was that in a prior operation, as for instance, gastrojejunostomy, the towel had been placed in the stomach to prevent the flow of matter from the intestines into the stomach and had been inadvertently left in the stomach when the patient's abdominal surgical wound was closed.

4. After the operation by Dr. Grose the plaintiff was subsequently treated at the Marine Hospital in Baltimore, medically and surgically. He was later examined by Dr. Grose and found to have sustained a serious hernia which was attributed by Dr. Grose to the after effects of the operation at Hopkins thought to have been caused by inflammation or infection as a postoperative result of the removal of the towel.

5. The present physical condition of the plaintiff is that he gets some relief from the effects of the hernia by wearing a corset. He is able to walk about and stand around but cannot well lean forward either standing or sitting in a chair. After three or four hours of any activity he finds it necessary to rest, preferably by lying down. In Dr. Grose's opinion he is not employable industrially but could do clerical work if otherwise qualified therefor. As the plaintiff is nearly 50 years of age and a mechanic by prior occupation, it is doubtful if he could engage in any gainful employable pursuit.

6. The Army Hospital at Ft. Belvoir, Virginia, is a regional hospital with a large staff of hospital employees and with numerous patients in different wards. The Chief Surgeon at the hospital at that time, is now in private practice in New York City. He testified as a witness for the government that the operation at Ft. Belvoir upon the plaintiff had been conducted by himself; that he recalled the case of the plaintiff for two reasons (1) that the plaintiff was an older man than most of the Army patients and (2) because the plaintiff spoke English imperfectly. He did not recall in precise detail all the incidents of the particular operation but stated definitely that the operation was for cholecystostomy, which involved no opening of the stomach and that in fact he had never performed (the operation of) gastrojejunostomy while he was in the Army service. He had been in private practice specializing as a surgeon for some ten years or more before entering the Army where he saw service in Africa and Italy before being appointed as Chief Surgeon at Ft. Belvoir. He is a graduate of recognized medical schools and a lecturer on surgery in one of them. He referred to a recorded account of the operation dictated by him to a secretary and signed by

710

him shortly after the operation had been performed on the plaintiff, in accordance with the customary requirements of the Army. This account of the operation showed that it was for cholecystostomy which did not involve gastrojejunostomy requiring an opening of the stomach. He said that the original purpose of the operation was to remove the gall bladder but he found upon examination that it was located in such a way that this was impossible and therefore he substituted for the removal of the gall bladder the insertion of a drain. The operation including the administration of the anesthetic lasted about four hours, and after the operation the patient was placed in an oxygen tent. He was not sure of the length of the incision that was made. Ordinarily such an operation would require only a three-inch incision. This particular one might possibly have required more. He did not use any towels such as that later found in the plaintiff's stomach although such ordinary hand and face towels were doubtless in the operating room. Such towels and bandages as were used were attached to metal clips to insure facility of removal after the operation and if one had inadvertently been left in the opening it would have been discovered by an X-ray. His attention was not again called to the particular operation until a few months ago when he received a letter of inquiry from the Army stating that suit had been filed by the plaintiff based on an operation at Ft. Belvoir while he was Chief Surgeon there. The suit was filed July 31, 1947. The government did not call as witnesses any other members of the hospital staff, either assistant surgeons or nurses some of whom must have been present during the operation. The Assistant United States Attorney stated that he was unable to ascertain who they were so long after the operation.

7. A few days after the plaintiff's honorable discharge from the Army he filed a formal application for service-connected disability benefits with the Veterans' Administration. On March 11, 1946 the plaintiff was allowed 30% disability for the removal of the kidney while in the Army, in the amount of a monthly payment of

$34.50. Later, consequent upon further regular physical examinations, after the removal of the towel from the plaintiff's stomach and his subsequent increased disability, his disability rate was increased on October 16, 1947 so that he now has for some time past been receiving monthly checks for $138 as 100% disability. In all he has received to date as of April 30, $3,645.50, and on estimated life expectancy of 22 years under existing legislation, will prospectively receive $31,947 in addition. The original disability allowance of $34.50 was fixed by statute as the amount payable for the removal of one kidney. The increase in the allowance was in the discretion and judgment of the Veterans' Administration. By stipulation of the parties the life expectancy of the plaintiff at his present age, based on ordinary average mortality tables, is 22 years. His earning capacity at the Martin plant had been about $1.30 an hour with some reasonable expectation of advancement if the plaintiff had been able to return to work in the usual way. The commuted value of this earning capacity for an estimated life expectancy of 22 years would be about $45,000.

■ From the evidence as a whole, despite the factual difficulties and uncertainties, I conclude that the facts justify the finding that the towel must have been placed in the plaintiff's abdomen or stomach at the time of the operation at Ft. Belvoir as alleged; and the failure to remove it before closing the surgical wound was negligence on the part of agents or employees of the government at the hospital. There was no evidence of any abdominal operation on the plaintiff other than those mentioned; and it is highly improbable that the towel could have been left in the plaintiff at the time of the kidney operation.

I conclude also that if the plaintiff is entitled to recover at all in this case the actual and prospective payments made to him by the Veterans' Administration must be, as conceded by plaintiff's counsel, treated as diminution of the amount of the verdict; and in view of all the evidence in the case, including the plaintiff's various medical and surgical disabilities

preceding the operation at Ft. Belvoir, I would conclude that presently a sum of $7,500 would be an appropriate verdict.

However, I conclude as a matter of law and for the reasons now to be stated, that the Federal Tort Claims Act does not cover this case of the plaintiff because it was a service-connected disability occurring while the plaintiff was an enlisted man in the United States Army and occurring as a result of negligence on the part of employees of the government at the hospital.

### Opinion.

This case is an unusual one on the facts, and novel as to the law, and difficult as to both. The question of primary importance is whether the Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq. covers the case, that is, does it apply to a suit by an enlisted soldier in the Army of the United States injured by the alleged negligence of an Army officer as a surgeon who performed the operation on the plaintiff, or by his assistants in the operation who were employees in the United States Army, the operation having been conducted at Ft. Belvoir, Virginia, on July 3, 1945. This question was first presented to the court on a motion by the United States to dismiss the complaint principally on the ground that the Act did not cover the case. An extended opinion was filed October 23, 1947, discussing this question and stating the arguments pro and con, toward the end of which it was stated: "In view of the novelty and difficulty of the question presented by the motion to dismiss, I have concluded that it should be overruled at this time without prejudice. Perhaps the proper application of the Act will become clearer on further argument and consideration and the possible narrowing of issues by the developed facts of the particular case."

At the recent trial of the case the same question was more fully and elaborately argued by counsel orally and in briefs submitted to the court and I have given further consideration to the question. As a result of this, I reach the conclusion of law that the Act does not cover this case. In addition to the considerations mentioned in the opinion (Jefferson v. United States, D.C., 74 F.Supp. 209) I have had the benefit of a recent decision of the Circuit Court of Appeals for the Fourth Circuit (State of Maryland, use of Burkhardt v. United States, 4 Cir., 165 F.2d 869) in another case involving an interpretation of the Act with respect to the applicable period of limitations, and have considered more fully the effect of other federal statutes applicable to the relations of officers and enlisted men of the United States Army to the Government of the United States. The most important of these federal statutes are those relating to the Veterans' Administration under which it now appears from the record in the case that the plaintiff is in receipt of a monthly disability allowance of $138.

The problem of statutory construction now presented is whether the comprehensive phrase "any claim against the United States, for money only" in section 410(a) of the Act, 28 U.S.C.A. § 931(a), without words of limitation as to classes of persons who may make the claim, should be narrowed by construction to exclude claims made by members of the Armed Forces of the United States for service-connected injuries sustained while in such service, in view of the special relationship long existing between the United States and members of its military forces, and the large body of federal legislation upon the subject. These include elaborate provisions for pay and allowances and retirement benefits for persons in the United States Army and Navy respectively; and even more importantly for the instant case are the statutes providing benefits for war veterans which stem from the First World War with many amendments now codified in 38 U.S.C.A., and regulations issued thereunder.[1]

It is a familiar rule of statutory construction that the merely literal reading of particular words in an Act can be

---

[1] See also 10 U.S.C.A. §§ 671–920, and 938–1032; 34 U.S.C.A. §§ 381, 440, and 865a–1001; 37 U.S.C.A. relating to the Army, Navy, Marine Corps, Coast Guard, Coast and Geodetic Survey and Public Health Service, and 50 U.S.C.A. War Appendix, § 1001 et seq.

narrowed by constuction where, from the whole subject matter of the particular Act and its setting in the whole governmental scheme, the court can see that the literal import of the phrase used is contrary to established policy and would not accord with the real intention of Congress in passing the Act, and for this purpose we may "look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail." Takao Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67, 67 L.Ed. 199; United States v. Sweet, 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473; United States v. Arizona, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371. The problem here is made more difficult by reason of the fact, as noted in the previous opinion in this case, that section 421 of the Act, 28 U.S.C.A. § 943, contains numerous types of claims which are excepted from the coverage of the Act, none of which, however, include the instant situation, although in a prior proposed Act for the same general purpose, there was included such an exception. Nevertheless, as previously stated, I reach the conclusion that the implied exception does exist in this case. Some of the considerations which influence this view will now be stated.

It is not unusual in statutory construction to limit a general phrase by other provisions appearing in the Act as a whole. In the present case, the situation is different in that the implied exception comes not from other wording of the Act itself but from long existing other legislation without cross-reference from one to the other. But there is a fairly close precedent for the application of the latter in the cases of Dobson v. United States, 2d.Cir., 27 F. 2d 807, certiorari denied 278 U.S. 653, 49 S.Ct. 179, 73 L.Ed. 563, and O'Neal v. United States, D.C., 11 F.2d 869, affirmed 11 F.2d 871, and Bradey v. United States, 2d Cir., 151 F.2d 742, where, in suits brought against the United States under the Public Vessels Act, 46 U.S.C.A. §§ 781 to 790, it was held that the general language in the Act allowing "A libel personam in admiralty may be brought against the Unit-

ed States * * * for damages caused by a public vessel of the United States", is not sufficient to impose liability on the United States in a suit brought by a seaman on a public vessel for injuries due to alleged negligence of other members of the crew. And in Burkhardt v. United States, 4th Cir., 165 F.2d 869, the literal wording of another phrase in section 410(a) of the Act, 28 U.S.C.A. § 931(a) was held not applicable in view of other provisions of the Act with regard to limitations.

It is clear enough that the main purpose of the Act was to waive the then existing sovereign immunity of the United States with respect to the ordinary run of tort claims arising in the United States. See Employers' Fire Ins. Co. v. United States, 9 Cir., 167 F.2d 655; and Grace v. United States, D.C.Md., 76 F.Supp. 174. But it is to be noted that the Tort Act was only a part, Title IV, of an even more comprehensive Act entitled the "Legislative Reorganization Act of 1946". As emphasized in the Burkhardt case, supra, section 131 of Title I of this Legislative Reorganization Act, 60 Stat. 831, prohibited institution in Congress of *private bills* for the payment of money for property damages or for personal injuries which might thereafter be made the basis of suits in a district court under the Tort Claims Act. It is well known that in recent years Congress has been quite flooded with private bills of that nature, and it was obviously one of the important purposes of the whole Act to transfer consideration of such claims from an otherwise overburdened Congress to the federal courts. In this respect the Tort Act, Title IV, was complementary to the provisions of section 131 of Title I of the Legislative Reorganization Act. It is thus fairly inferable that an important if not the main motivation of Congress in enacting the Tort Act was to transfer such claims to the courts. But so far as I am aware, private bills for the benefit of soldiers for damages resulting from service-connected injuries were at least not common, in view of the long established provisions for the armed forces, including the Veterans' Administration established during or shortly after the First World War. It is probable, therefore, that claims of that nature, as

illustrated by the instant case, were not within the contemplation of Congress in enacting this particular legislation.

What Congress must have specially had in mind was the ordinary run of tort claims affecting ordinary citizens or others arising from time to time. This is apparent from the phraseology adopted in section 410(a) furnishing the test of liability "in accordance with the law of the place where the act or omission occurred." And this particular purpose of the Act becomes even more apparent when reference is made to the Committee Reports of the Senate and House in submitting the Legislative Reorganization Act. Thus, it was said in Senate Report No. 1400, and also in the House Committee Report of July 22, 1946, in summarizing the existing law and purpose of the Tort Act as follows: "As a result of the statutes briefly summarized above, the Government is subject to suit in contract, on admiralty and maritime torts, and for patent infringement. On the other hand, no action may be maintained against the government in respect to any *common-law tort*. The existing exception in respect to *common-law torts* appears incongruous. Its only justification seems to be historical. With the expansion of governmental activities in recent years, it becomes especially important to grant to *private individuals* the right to sue the government in respect to such torts as negligence in the operation of vehicles." (Italics supplied.)

And again in commenting on the stated exceptions to the Act appearing in section 421, it was said that the exceptions include "claims which relate to certain governmental activities which should be free from threat of damage suits, or for which adequate remedies are already available."

I do not interpret the reference to common-law torts in the strictly technical sense of the term because the test of liability as stated in section 410(a) is somewhat broader in that it would include statutory torts, such as suits under Lord Campbell's Act for death claims provided for by the statutes of the particular States, which were not theretofore cognizable at common law. But it would seem clear enough that injuries sustained by members of the armed forces of the United States during their service would not be within the general scope of the kinds of actions to which the Committee Report was referring because it is clear enough that such injuries did not constitute common law or statutory torts under the laws of the several States. Indeed it is not understandable how any State legislation could properly have affected the relations of the United States to members of its armed forces which, of course, depended purely on federal law.

Still further support for the conclusion reached is to be found in the recent decision of the Supreme Court in United States v. Standard Oil Co. of California, 332 U.S. 301, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067, where the dominant issue was whether the United States was subrogated to the right of action of a soldier against a third person, by reason of expense incurred by the government in caring for its soldiers under existing federal legislation. The court held that the right of subrogation did not exist because not provided for in federal law, and that it would be incongruous to give such a right of action in view of the variable State laws which might apply to any particular soldier dependent upon where he happened to be at the time. Thus in the opinion it was said: "Not only is the government-soldier relation distinctively and exclusively a creation of federal law, but we know of no good reason why the Government's right to be indemnified in these circumstances, or the lack of such a right, should vary in accordance with the different rulings of the several states, simply because the soldier marches or today perhaps as often flies across state lines."

And again at page 305 of 332 U.S., page 1607 of 67 S.Ct., 91 L.Ed. 2067: "Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces. To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces * * * the scope, nature, legal incidents and consequences of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority."

The case strongly emphasizes the particular nature of government-soldier relationship and this furnishes strong support for the view that it was not the intention of Congress in passing the Tort Claims Act to include in the phrase "any claim" those by former soldiers for service-connected disabilities for which there was already existing a large body of federal legislation.

Again it may be noted that section 410(a) also provides with respect to the test of liability as follows: "Subject to the provisions of this title, the United States shall be liable in respect of such claims, to the same claimants, in the same manner, and to the same extent, as a private individual under like circumstances".

This phraseology is seemingly inapt if it had been the intention of Congress to give soldiers additional redress for service-connected disabilities. It is hardly conceivable to analogize the liability of the United States to that of a private individual in respect to service-connected disabilities in view of the government-soldier particular relationship.

It is also to be noted that section 424(a) of the Act 60 Stat. 846, not included in codification in 28 U.S.C.A. § 921 et seq. repeals certain specific statutes authorizing "any Federal agency to consider, ascertain, adjust, or determine claims on account of damage to or loss of property, or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, * * * in respect of claims cognizable under part 2 of this title" (which provides for an administrative action) and accruing on and after January 1, 1945, including, among other statutes so repealed "Public law numbered 112, as amended. Seventy-eighth Congress, approved July 3, 1943 (57 Stat. 372, U.S.C. title 31, secs. 223b, 223c and 223d)." Section 223b known as the Military Claims Act, authorized the Secretary of the Army to determine, settle and pay any claims for damages not in excess of $1,000 "caused by military personnel or civilian employees of the Department of the Army". Counsel for the respective parties advance contrary

arguments from this repealing section of the Act. For the plaintiff, it is argued that prior to the Act it was the policy of Congress by the Military Claims Act to recognize claims by as well as against military personnel at least up to $1,000; and that the provision was repealed because thereafter such claims were comprehensively covered by the Tort Act. But to the contrary, counsel for the government points out that by the amendment of May 29, 1945, the prior Act of 1943 was amended to exclude "claims for personal injury or death of military personnel or civilian employees of the Department of the Army or of the Army if such injury or death occurs incident to their service." This, he says, is indicative of the general policy of Congress not to recognize claims by military personnel for injuries occurring incident to their services, other than through pensions or Veterans disability allowances. And he further points out that anyhow the Military Claims Act authorizes settlement only up to $1,000 and the purpose of the repeal was because the Act was no longer necessary by reason of the provisions of Part 2 of Title IV of the Tort Act 28 U.S.C.A. §§ 921, 922, which provided for administrative adjustment of tort claims against the United States. The latter reason for the repeal seems sound and I therefore find no reason to think that the repeal of this particular statute aids the plaintiff's construction of the Act. On the contrary, the quoted proviso in the Military Claims Act is at least indicative of general congressional policy not to recognize claims by military personnel for service-connected disabilities otherwise than through the general statutory provisions.

The government relies on some other defenses which need be only mentioned. The most important of these is the contention that even if the Tort Act covers this case the voluntary acceptance of veteran's benefits by the plaintiff constitutes an election to rely upon that form of relief and excludes the right to have a cumulative remedy by suit for tort. In support of this contention counsel cite cases to the effect that suits by various employees of the United States to recover for injuries sustained from other employees of the government,

acting in the course of their duties, have been barred by the voluntary acceptance of benefits under the Federal Employees' Compensation Act, 5 U.S.C.A. § 751 et seq., covering civilian as distinct from military personnel. These cases were referred to in the prior opinion in this case but without the necessity of expressing an opinion thereon.[2] While there is at least a plausible analogy between the principles involved in the cases cited and that of the instant case, I do not find it necessary to now base a decision thereon in view of the conclusion already reached.

 Because the cause of action, if any, in this case, arose in the State of Virginia, it is contended that the limitation statute of that State should be here applied instead of the law of the forum. It is said that the Virginia Code of 1942, § 5818, established a period of one year for a suit of this nature and that the instant suit was not brought within one year. But this contention is now clearly untenable in view of the decision in the Burkhardt case, supra, that the limitation period in the Tort Claims Act itself is controlling. As provided in section 420 of the Act, the suit was brought within one year thereafter.

Counsel for the government also contends that as the test of liability is that established by the law of the place where the cause of action arose, in this case Virginia, the defense of the fellow-servant doctrine which exists in Virginia in cases of suits for damages resulting from negligence, should apply. But it seems quite clear that this defense would not be applicable in the instant case, where a surgical operation is performed upon the plaintiff, because the operating surgeon and the patient could not fairly be described as co-workers even if they were co-employees of the same employer.

In view of the conclusion reached as to the scope of the Act it was of course unnecessary to make specific findings of fact with regard to the act of negligence alleged by the plaintiff. But I have done so in this case in view of the doubtful question of the proper coverage of the Act, and for the purpose of possibly avoiding the necessity of further loss of time and expense to the parties and witnesses for a retrial, in the event that the case should be appealed and it should be finally held that the case is covered by the Act.

 As previously indicated, the case is a difficult one on the facts as well as on the law. The nature of the suit is a typical one for professional malpractice; but nevertheless the facts of the particular case are quite unusual and the conclusion which I have reached on the facts that there was negligence proximately resulting in damage to the plaintiff is not free from all doubt. However, in view of the length of this opinion and the prior opinion in the same case, I will not unduly prolong discussion of the facts because, although they are unusual, after all it is merely a fact question to be determined by the court without a jury. The plaintiff is not obliged to prove the fact beyond a reasonable doubt, but only by a preponderance of the evidence. To establish the negligence plaintiff's counsel relies strongly upon the common law doctrine or rule of *res ipsa loquitur*. It is conceded by counsel on both sides that the rule applies in proper cases both under the Virginia and Maryland decisions and my attention has not been directed to any important difference between the two States with respect to the application of the rule to the instant case.[3]

[2] The cases referred to are Brady v. Roosevelt S. S. Co., 317 U.S. 575, 577, 581, 63 S.Ct. 425, 87 L.Ed. 471; rehearing denied 318 U.S. 799, 63 S.Ct. 659, 87 L.Ed. 1163; Dahn v. Davis, 258 U.S. 421, 42 S.Ct. 320, 66 L.Ed. 696; Militano v. United States, D.C.N.Y., 55 F.Supp. 904; United States v. Marine, 4 Cir., 155 F.2d 456, affirming, D.C.Md., 65 F.Supp. 111; See also the discussion in a case note in Vol. 61 Harvard Law Review 550, on the former opinion in this case; and an analysis of the Tort Act by District Judge Hulen, printed in 7 F.R.D. pages 689, 694, 695.

[3] For a review of the Maryland cases, see an extended paper upon the subject by Mr. Roszel C. Thomsen of the Baltimore Bar, to be found in Vol. III Maryland Law Review, pp. 285 to 313. See also for a recent discussion of the rule in this Fourth Circuit, Lachman v. Penn Greyhound Lines, 4 Cir., 160 F.2d 496; Coca-Cola Bottling Co. v. Munn, 4 Cir., 99 F.2d 190.

716

But the rule itself is only one from which after proof of the main fact alleged by the plaintiff, the trier of facts is permitted to infer negligence in the absence of a sufficient exculpatory explanation by the defendant. In this case the fact alleged by the plaintiff is the negligent failure of the defendant to remove a towel from his abdomen or stomach which had been placed there in the course of surgical operation on July 3, 1945 at Ft. Belvoir, Virginia. There is no direct proof of this particular fact alleged and the rule of *res ipsa loquitur* would not of itself be sufficient to prove the fact as well as the inference of negligence. However, on the evidence as a whole, I have found as a fact that the towel must have been placed or left in the plaintiff's body at Ft. Belvoir, Virginia. And having thus found this fact the rule justifies the inference that there must have been negligence in leaving the towel in the plaintiff's body, in the absence of any convincing evidence of the lack of negligence in doing so. The only evidence submitted by the defendant with respect to the operation in question was to the effect that no towel was used in the operation. Of course if the trier of facts so found, that would be an end of the plaintiff's case. But as I have felt obliged to reject this conclusion of fact, I must treat the case as one where the fact has been proved and there is no explanation by the defendant of how the very unusual fact occurred.

For the reasons stated, I have concluded that the complaint must be dismissed with allowance of the usual taxable court costs. Counsel may submit the appropriate order in due course.