CITIZENS COMMITTEE FOR THE HUDSON VALLEY and Sierra Club, Plaintiffs,

v.

John VOLPE, individually and as Secretary of Transportation of the United States, Walter F. Hickel, individually and as Secretary of the Interior of the United States, Stanley S. Resor, individually and as Secretary of the Army of the United States, and William F. Cassidy, individually and as Chief of Engineers, Corps of Engineers of the U. S. Army, Defendants.

CITIZENS COMMITTEE FOR THE HUDSON VALLEY and Sierra Club, Plaintiffs,

v.

J. Burch McMORRAN, individually and as Commissioner of the Department of Transportation of the State of New York, Defendant.

VILLAGE OF TARRYTOWN, NEW YORK, Plaintiffs,

v.

John VOLPE, individually and as Secretary of Transportation of the United States, Walter F. Hickel, individually and as Secretary of the Interior of the United States, Stanley S. Resor, individually and as Secretary of the Army of the United States, and William F. Cassidy, individually and as Chief of Engineers, Corps of Engineers of the U. S. Army, Defendants.

VILLAGE OF TARRYTOWN, NEW YORK, Plaintiffs,

v.

J. Burch McMORRAN, individually and as Commissioner of the Department of Transportation of the State of New York, Defendant.

Nos. 69 Civ. 295, 305, 354 and 448.

United States District Court
S. D. New York.

July 11, 1969.

Winer, Neuburger & Sive, New York City, for plaintiffs (David Sive and Alfred Forsyth, New York City, of counsel).

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, for federal defendants (Peter R. DeFilippi and H. Thomas Coghill, New York City, of counsel).

Louis Lefkowitz, Atty. Gen. of the State of New York, for defendant McMorran (Mark I. Walsh and Joel Sachs, New York City, of counsel).

THOMAS F. MURPHY, District Judge.

These four actions, consolidated for trial, challenge the construction of the proposed Hudson River Expressway on a variety of grounds.

· The Citizens Committee for the Hudson River Valley is an unincorporated association of citizens who reside in the area of the proposed Expressway. The Sierra Club is a non-profit conservationist corporation organized in California with various chapters throughout the United States. Tarrytown is an incorporated village of New York State, and one of the communities through which the Expressway will pass.

The federal defendants are public officials charged with certain statutory duties related to the issues involved and the defendant, J. Burch McMorran, is the Commissioner of the Department of Transportation of the State of New York, the builder of the proposed Expressway.

The Expressway, as proposed by the New York State Department of Transportation, is planned to be a six lane arterial highway which will accommodate both passenger and commercial traffic. As conceived it will extend approximately nine miles along the east shore of the Hudson River from the Tappan Zee Bridge at Tarrytown north to Crotonville, New York. Approximately 22,000 feet of the road will rest on 9,500,000 cubic yards of fill which will extend at its widest point 1300 feet into the river. No part of the project will involve the expenditure of federal funds.

On February 21, 1968, the State Department of Transportation, pursuant to 33 U.S.C. § 403 (Rivers and Harbors Act of 1899), applied to the Corps of Engineers for a permit authorizing the fill operation which would take approximately two years to complete. When the permit

was authorized by the Secretary of the Army and issued by the Corps on January 27, 1969, the plaintiffs sought a preliminary injunction restraining its delivery. This relief was denied, Citizens Committee for Hudson Valley v. Volpe, 297 F.Supp. 804 (S.D.N.Y.1969), and the Court of Appeals affirmed, (2d Cir. 1969) [1] but ordered an immediate trial on the merits.

The plaintiffs' major claim is that since the Expressway project involves *dikes, causeways and bridges* to be built over or in a navigable waterway of the United States, the Corps exceeded its statutory authority in issuing the permit without the prior approval of Congress and/or the federal Department of Transportation, as required by 33 U.S.C. § 401 of the same Rivers and Harbors Act of 1899.

Section 403, under which the Corps issued the permit provides:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited * * * and it shall not be lawful to excavate or fill [in a navigable waterway of the United States] * * unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." 33 U.S.C. § 403 (1899).

Section 401, claimed by the plaintiffs to be applicable, provides:

"It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river * * * of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the

Chief of Engineers and by the Secretary of the Army * * *." 33 U.S.C. § 401 (1899).

The needed approval of the Secretary of Transportation of the United States becomes a factor in the case as a result of the evolution of section 401. By two subsequent statutes "bridges" were removed from the specific consent of Congress requirement. In 1946 Congress enacted the General Bridge Act, 33 U.S.C. § 525 et seq. Section 525 of this Act grants the consent of Congress for the construction of any bridge over navigable waters if the bridge is approved by the Chief of Engineers and the Secretary of the Army. However, Congress still reserved its jurisdiction over dikes and causeways referred to in section 401 of Title 33. In 1966 Congress enacted the Department of Transportation Act, 49 U.S.C. § 1651 et seq. Section 1655 of that Act transferred certain powers and duties of other federal departments to the Secretary of Transportation. Subsection (g) of that section transferred jurisdiction over bridges and causeways in navigable waters of the United States from the Secretary of the Army to the Secretary of Transportation.

Consequently, the construction of a bridge over or in navigable waterways now requires approval of the Corps of Engineers acting under the Secretary of the Army and the Secretary of Transportation; the construction of a dike requires the consent of Congress and the Corps of Engineers when authorized by the Secretary of the Army; the construction of a causeway requires the consent of Congress and the approval of the Secretary of Transportation.

Since the Corps of Engineers as authorized by the Secretary of the Army issued the permit without the consent of Congress or the Secretary of Transportation, it exceeded its statutory authority

---

1. In Citizens Committee for Hudson Valley v. Volpe, 297 F.Supp. 809, which granted New York State's motion to dismiss the actions against it on the ground of sovereign immunity, the plaintiffs' claims against McMorran were restricted to

whether "[s]ection 340–c of the New York Highway Law is unconstitutional in that it violates the Fourteenth Amendment and [is the construction of] the Expressway * * * a violation of their Fifth Amendment rights." 297 F.Supp. at 814.

if there is a bridge, dike, or causeway involved in the permitted project. We come, therefore, to what is the most crucial issue in the case.

It is undisputed that the Hudson River is a navigable waterway of the United States, and that in both the permit issued by the Corps, and the New York State plans accompanying the permit there are numerous references to "dikes." Page 1 of the Permit states: "you are hereby authorized by the Secretary of the Army to dredge and place fill protected by stone slope protection and to construct piers and bulkheads with floats and mooring piles; the dredged material to be suitably *retained by dikes* to prevent its return into the waterway * * *." (Emphasis added.) In the State plans or drawings attached to the permit there are four references to stone and/or rock dikes.

In the plans prepared by the State in connection with the securing of bids, three types of dikes are specifically illustrated and described. The main type, the rock dike, will run along the entire length of the western side of the fill in order to prevent the fill from returning to the river.

■ The defendants, while accusing the plaintiffs of arguing semantics, postulate that what is called a dike (by the various engineers who prepared the plans for the State Department of Transportation and the Corps of Engineers) is not really a dike since a real dike has a different purpose from their dikes. They also argue, assuming dikes are involved, that section 401 is still not applicable since their dikes would not substantially affect navigation. The court in denying the preliminary injunction agreed with this latter argument reasoning that the plaintiffs would probably not succeed on the merits because the Expressway would not substantially interfere with navigation and because the federal Department of Transportation interposed no objec-

tion.[2] The Court of Appeals in affirming the denial of the temporary injunction did not pass on this issue.

The defendants urge that Congress, in using the term "dike" in 1899, meant a structure that would be within the definition set forth in Chambers Technical Dictionary, p. 273 (3d Rev. ed. with Supp. 1958), which was originally published in 1940, i. e., "a wall or embankment of timber, stone, concrete, fascines, or other material, built as a training works for a river so as rigidly to confine flow within definite limits over the length treated." From this definition they conclude that a real dike must substantially affect navigation since it confines river flow, and since the dikes in their plans do not substantially affect navigation they are not dikes as Congress used the term.

The plaintiffs submit that Congress, in prohibiting "any dike" reserved for itself the determination of the effect of the dike on navigation and any other matter deemed of consequence. Therefore, they argue, that once a dike, any dike, is to be constructed in navigable water of the United States it is Congress, and not the courts, who will consider its effects on navigation in determining whether to approve the structure or no.

What is posed, therefore, is are there dikes involved in this project and what did Congress mean when it legislated, "it shall not be lawful to construct or commence the construction of *any bridge, dam, dike or causeway* over or in any * * * navigable river * * * until the consent of Congress to the building of such structure shall have been obtained * * *."

■ We hold, based on the evidence presented at trial, that "dikes," characterized as such by the defendants, are to be constructed along the western side of the fill and that Congress when it said "any dike" over or in any navigable river meant exactly that. Therefore, the Corps

2. The denial of the plaintiffs' motion for a preliminary injunction does not affect our final determination of the issues. Harvey Aluminum, Inc. v. American Cyanamid Co., 15 F.R.D. 14 (S.D.N.Y. 1953); 7 J. Moore, Federal Practice § 65.21 (2d ed. 1953).

of Engineers exceeded its statutory authority in issuing the permit which enables the State to commence advertising for bids.

In the absence of any legislative or judicial authority to support the defendants' theory of statutory interpretation we apply the ordinary meaning to the term "any dike." Dike is defined as "[a] bank, as of earth, thrown up to form a barrier, line of demarcation or the like * * *." Webster's New International Dictionary, 2d Ed., p. 730 (1954); "An embankment for controlling or holding back the waters of the sea or a river." Random House Dictionary of the English Language, p. 403 (1967). "Statutes are to be construed by attributing its ordinary meaning to the language used." United States v. Peller, 170 F.2d 1006, 1007 (2d Cir. 1948). Consequently, we hold that if Congress meant to confine its jurisdiction to only those dikes that substantially affect navigation, it would have said so. Since proposed dikes are involved and will be "over or in" a navigable river of the United States, we leave to Congress, when it decides if it will approve the project, the consideration of the effect of the dikes on navigation.

Even if this interpretation is incorrect we find that the proposed rock dikes come within the definition proposed by the defendants, i. e., the rock dike will control the flow of the river insofar as it will prevent the river from eroding the fill and returning to the natural shore line. It will also, according to a government expert, increase the force of the ebb tide by 10 percent.

In addition to the consent of Congress being required because of the presence of dikes, we hold that approval of the Secretary of Transportation of the United States is required since causeways are also involved in the construction of the project.

The plaintiffs claim that the entire fill area of the project will be a causeway since it will be support for a raised road over water. We disagree and accept the defendants' definition of a causeway, i. e.,

its ordinary meaning connotes a raised road across water or marshy land with the water or marshy land on both sides of the road. Since the fill will be bounded by water on only one side (the west), it, in itself, is not a causeway.

However, the proof at trial clearly shows a causeway supporting the road where it leaves the natural shore line south of the Tappan Zee Bridge until the road reaches the southernmost point of the fill. On the map, opposite page 14 of the booklet "The Hudson River Expressway and the Hudson River Expressway Park," which was published by the State Department of Transportation, the southern lane of the Expressway at this point is clearly out in the river with water on both sides. The detailed model of the project, which was introduced into evidence by the State, also shows this portion of the Expressway to clearly be a causeway within the definition urged by the defendants.

While this causeway is not per se part of the fill project which the Corps of Engineers' permit authorized, we hold that the Corps still had the obligation to consider it and recognize its reality before issuing the permit.

The Corps in considering the application of the State was not operating in a vacuum. It had before it detailed maps, drawings and plans of the entire project. It certainly knew the entire route of the six lane road. Before it issued the permit the Corps of Engineers held public hearings at which time a full description of the project and the route of the road was given. By not securing the approval of the United States Secretary of Transportation on the causeway it was in effect delaying the inevitable by requiring the State, after it had expended millions of dollars in filling the river with 9,500,-000 cubic yards of fill, to then apply for the Secretary's approval of the causeway which is immediately south of the fill. By doing so the Corps effectively relinquished the jurisdiction of the federal Department of Transportation, and its discretion to deny the approval of the

future causeway, for how could the Secretary of Transportation deny the future request, if he were to be so inclined, after the enormous expense and work the State would have had already put into the project.

■ Such a piecemeal approach to the exercise of federal agency jurisdiction would also frustrate one of the main purposes of the Department of Transportation Act, i. e., the conservation of the country's natural resources.[3] Before the Secretary of Transportation is to approve any project within his jurisdiction he has to determine, *inter alia,* the effects of the project on the natural resources of the area.[4] If this massive fill project is completed before his approval is sought, he will be presented with a *fait accompli.* There will not be any need for him to consider the effects on natural resources as the harm, if any, will be done.

■ In view of this congressional intent encompassed in the Department of Transportation Act we hold that the Corps of Engineers exceeded its statutory authority in ignoring the presence of the causeway [5] when it issued the permit without prior approval of the Secretary of Transportation.[6]

■ The defendants have consistently urged that this court has no jurisdiction over the subject matter of this dispute. Concededly there is no separate statutory authority which grants jurisdiction to the district courts to have a decision of the Secretary of the Army reviewed. Yet, we hold that the Administrative Procedure Act, 5 U.S.C. § 701 et seq., justifies this Court's jurisdiction.[7]

3. "It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and water fowl refuges, and historic sites." 49 U.S.C. § 1651(b) (2) (1966).

4. "After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and, (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use." 49 U.S.C. § 1653(f).

"The Hudson River Expressway and the Hudson River Expressway Park," published by the New York State Department of Transportation, states: "The setting within which these complementing projects are to be undertaken is characterized by striking natural beauty, important historical significance, and harmonious residential development" (at page 1).

5. Since the presence of causeways in the project necessitates the approval of the Secretary of Transportation, we have not deemed it necessary to determine if bridges are present.

6. Since the Corps of Engineers has exceeded its statutory authority within the meaning of 5 U.S.C. § 706(2) (C) (1966), we have not deemed it necessary to determine if the Corps was also arbitrary and capricious within the meaning of § 706(2) (A) of Title 5. See note 7, *infra.*

7. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

"The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights * * *." 5 U.S.C. § 706.

While there is an apparent conflict in this circuit, the Supreme Court has implemented what appears to be a presumption in favor of a finding of jurisdiction under the Administrative Procedure Act. In Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), it was held that the courts should restrict access to judicial review "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent * * *." 387 U.S. at 141, 87 S.Ct. at 1511, citing Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). See also, Powelton Civic Home Own. Ass'n v. HUD, 284 F.Supp. 809 (E.D.Pa.1968).

A 1966 decision in this circuit held that the Administrative Procedure Act constituted an affirmative grant of jurisdiction with respect to the review of federal administrative actions. Cappadora v. Celebrezze, 356 F.2d 1 (2d Cir. 1966). Judge McLean in Road Review League, Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967), followed the reasoning of *Cappadora* and referred to the Administrative Procedure Act as a "jurisdictional statute." 270 F.Supp. at 659.

A second circuit case that appears to hold, and has later been construed to hold,[8] that the Administrative Procedure Act does not confer jurisdiction is Ove Gustavsson Contracting Co. v. Floete, 278 F.2d 912 (2d Cir.), cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960). The court held in that case that the suit, while termed one for judicial review, was in reality a contract action against the United States and properly belonged in the Court of Claims. It went on to say that the Administrative Procedure Act does not extend the jurisdiction of the federal courts to cases not otherwise within their competence. Even though the court stated that the Act does not grant jurisdiction, it never had to reach that determination since there was really no agency action to be reviewed.

Since the presumption in favor of jurisdiction has not been rebutted by a clear and convincing presentation of an opposite legislative intent, we hold that this court has the necessary jurisdiction to rule on the dispute under the Administrative Procedure Act.

This court also has jurisdiction of the suit brought by the Village of Tarrytown under the federal question statute which provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 * * * and arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a) (1958).

The Village's claim is that it will lose tax revenues by the State condemnation of taxable property in the Village. In Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conf., 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), the same claim was the basis of one of the petitioners' standing to sue. See also, TVA v. Polk County, 68 F.Supp. 692 (E.D.Tenn.1945). Cf. Jacobs v. Tawes, 250 F.2d 611 (4th Cir. 1957); Denton v. City of Carrollton, 235 F.2d 481 (5th Cir. 1956).[9]

We also hold that all of the plaintiffs have standing necessary to maintain these actions. Under *Scenic Hudson, supra,* there is little doubt that the Village of Tarrytown has the necessary standing. There the court held, "The towns that are co-petitioners with Scenic Hudson have standing because the transmission lines * * * reduce tax revenues collected from privately held land, and significant-

---

8. National Maritime Union of America, AFL–CIO v. NLRB, 267 F.Supp. 117, 119 at n. 8 (S.D.N.Y.1967).

9. Since jurisdiction has been established under the Administrative Procedure Act and the Federal Question Statute, we do not determine if jurisdiction exists under the Mandamus Act (28 U.S.C. § 1361), the Commerce and Anti-Trust Statute (28 U.S.C. § 1337), or the Declaratory Judgment Act (28 U.S.C. § 2201).

ly interfere with long-range community planning." 354 F.2d at 616.

This is precisely what was proved by the Village in the instant case, namely, loss of tax revenues and interference with the Urban Renewal project already in progress in the Village. The proof offered by the Village of Tarrytown that it would lose over $10,000 in tax revenues contained some errors in computation. Nevertheless, this court is satisfied that the amount will at the very minimum exceed $10,000.

The standing problem becomes more acute with the Sierra Club and the Citizens Committee as they admittedly have no personal economic claim to assert. Rather they are "aggrieved" by the alleged destruction of the natural resources of the river. *Scenic Hudson, supra,* and its interpretation by *Road Review, supra,* create standing in this case if this court can find a "legislative intent" to create standing, absent a monetary claim, in the various statutes involved.

*Scenic Hudson* involved the Federal Power Act (16 U.S.C. § 791a et seq.). Section 313(b) of that Act (16 U.S.C. § 825l(b)) grants the right of judicial review to any party aggrieved by an order of the Federal Power Commission. The main petitioner was an unincorporated association consisting of a number of nonprofit conservationist organizations. Like the Sierra Club and the Citizens Committee in this case, they had no direct economic interest in the controversy. Yet, they were found to be "aggrieved parties" because the Federal Power Act was held to create a public interest in the scenic, historical, and recreational values of the area. The Court held:

"In order to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic,

conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be  *  *  * aggrieved parties under § 313(b). We hold that the Federal Power Act gives petitioners a legal right to protect their special interests." 354 F.2d at 616.

The *Road Review* case involved a dispute under the Federal Highways Act (23 U.S.C. § 101 et seq.). Again, there was no economic loss on the part of the conservationist plaintiffs. Unlike the Federal Power Act, the Federal Highways Act contained no specific authorization for judicial review. Instead the plaintiffs relied on the Administrative Procedure Act. The court, following the reasoning of *Scenic Hudson,* cited sections of the Highways Act (23 U.S.C. §§ 134, 138) and 23 C.F.R. § 1.6(c), all to the effect that administrative decisions under the Act must consider local needs, parks, historic sites and natural resources. 270 F.Supp. at 660–661. The court stated that these provisions were "sufficient, under the principle of *Scenic Hudson,* to manifest a congressional intent that towns, local civic organizations, and conservation groups are to be considered 'aggrieved' by agency action which allegedly has disregarded their interests. I see no reason why the word 'aggrieved' should have a different meaning in the Administrative Procedure Act from the meaning given to it under the Federal Power Act." 270 F.Supp. at 661.

The rule, therefore, is that if the statutes involved in the controversy are concerned with the protection of natural, historic, and scenic resources, then a congressional intent exists to give standing to groups interested in these factors and who allege that these factors are not being properly considered by the agency.[10]

---

10. After the plaintiffs had rested, the State moved unsuccessfully to dismiss since the plaintiffs had introduced no evidence to show their interest in the natural, historic, and scenic resources of the area and

hence had failed to prove their standing. During the State's case this interest was proved through the testimony of members of the Citizens Committee and Sierra Club. We base our decision that

In the instant case the Department of Transportation Act manifests the same congressional concern.[11] One of the regulations under which the Corps of Engineers issued the permit, 33 C.F.R. § 209.-330, calls for the consideration of the effects of the permit on fish, recreation, pollution, and natural resources as well as navigation.[12]

Therefore, under the guidelines of *Scenic Hudson* and *Road Review* both the Sierra Club and the Citizens Committee have the requisite standing to maintain these actions.

The remaining claim of the plaintiffs is that McMorran as a State official is proceeding under an unconstitutional statute, i. e., 340–c of the New York Highway Law, McKinney's Consol. Laws, c. 25, in violation of the Fifth and Fourteenth Amendments rights of the plaintiffs and, accordingly, should be enjoined. See note 1 *supra*.

The plaintiffs' brief characterizes the claim as follows: "Whether Article VII (New York State Constitution) has been violated is perhaps not a question before this court. The extent of the power granted to McMorran by the Expressway Law, § 30 of the Highway Law, and the legislature's lump sum budgets is of the essence of the constitutional claim."

Section 340–c of New York's Highway Law (McKinney's 1965), which authorizes construction of the Expressway provides:

"State expressway routes are hereby set forth and generally described as follows * * *.

"Beginning at a point on interstate route 503 in the vicinity of Beacon or in the vicinity of Wiccopee, to be determined by the superintendent of public works, thence in a generally southerly direction to the vicinity of Ossining and thence continuing southerly, west of U.S. route nine, along or near the Hudson River to a connection or connections with existing highways, as determined by the superintendent of public works, in the vicinity of the structure on the Governor Thomas E. Dewey Thruway known as 'The Tappan Zee Bridge'."

The plaintiffs claim this statute is an unconstitutional delegation of legislative power to the Commissioner in that it prescribes no standards to be followed in determining, *inter alia,* the exact route, width or nature of the Expressway. We disagree. To require a State legislature to prescribe every detail of a proposed State road, would shortly put an end to road construction on a State level. In Ahoyian v. Massachusetts Turnpike Authority, 211 F.Supp. 668, 669 (D.Mass.), aff'd, 371 U.S. 186, 83 S.Ct. 265, 9 L.Ed. 2d 228 (1962), it was held that the delegation of the exact path of a highway was not unlawful. The "[l]egislature cannot 'constitutionally (be) required to appraise before hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel (the Legislature) to prescribe detailed rules.'" City of Utica v. Water Pollution Control Board, 5 N.Y.2d 164, 169, 182 N.Y.S.2d 584, 588, 156 N.E.2d 301 (1959), citing American Power and Light Co. v. SEC, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103.

Moreover, the Commissioner of Transportation, when implementing section

---

plaintiffs Citizens Committee and Sierra Club have standing based on the evidence as a whole, including that introduced by the defendant New York State. Bates v. Miller, 2 Cir., 133 F.2d 645 (2 Cir.), cert. denied, Miller v. Bates, 320 U.S. 210, 63 S.Ct. 1446, 87 L.Ed. 1848 (1943) ; 9 Wigmore, Evidence § 2496 (3d ed. 1940).

11. See notes 3 and 4 *supra*.

12. Public Law 89–605, 80 Stat. 847 (1966) states that the Hudson River basin contains resources of "immense economic, natural, scenic, historic and recreational value to all the citizens of the United States * * *."

340-c of the Highway Law, is bound by the procedures and standards set forth by the New York State Legislature in section 340-d of the Highway Law. This latter section provides for, *inter alia*, the number and separation of lanes, access to the expressways and their maintenance. Sections 10 and 11 of the Highway Act mandate that the Commissioner make surveys, maps and plans in connection with the construction of roads. Before the Commissioner awards any construction contract, he must follow the procedures prescribed by the Legislature in section 38 of the Highway Law. In short, the Commissioner is not operating solely under section 340-c. Rather, he is bound by the many regulatory provisions contained in the entire Highway Law of New York.

■ We also hold that failure to give prior notice of the exercise of the power of eminent domain is not violative of due process. United States v. Southerly Portion of Bodie Is., 114 F.Supp. 427, 430 (E.D.N.C.1953) ; United States v. Winn, 83 F.Supp. 172, 174 (W.D.S.C.1949). Section 30 of New York's Highway Law sets forth the condemnation procedures to be followed by the Commissioner. Condemnation maps are filed in the Office of the County Clerk of the county in which the property is located and in the Department of State. Upon filing with the County Clerk, title vests in the State. Notice is then personally served on the former property owner who may then commence suit in the Court of Claims. If a former property owner remains on the land after the taking, the Commissioner must commence an eviction proceeding on 60 days notice. These procedures clearly meet the requirements of due process. Bragg v. Weaver, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135 (1919) ; Fifth Ave. Coach Lines, Inc. v. City of New York, 11 N.Y.2d 342, 229 N.Y.S.2d 400, 183 N.E.2d 684 (1962).

■ Although plaintiffs' complaints against McMorran make no mention of the appropriations the New York State legislature has provided for the Department of Transportation, there was received in evidence plaintiffs' Exhibit 91 which sets forth the appropriations for the Department of Transportation and its predecessor, the Department of Public Works, for the last few years, including the 1969 appropriation of $371,500,000. No other evidence was introduced on this score and plaintiffs' motion to conform their pleadings to the proof was granted.

We will assume that Exhibit 91 contains the appropriation bill passed by the New York Legislature in 1969, and that the budget procedures set forth by Article VII, §§ 1–4 of New York State's Constitution were carried out, resulting is a lump sum appropriation for the Department of Transportation in the amount of $371,500,000 for the purposes therein stated.

What puzzles us is why a lump sum appropriation violates the Fifth and Fourteenth Amendments rights of the plaintiffs. As we understand the plaintiffs' claim, it appears to be based on the lump sum appropriation as distinguished from an appropriation with more particularization. But particularization is not always necessary or expedient, especially where road construction is involved. People v. Tremaine, 281 N.Y. 1, 7, 21 N.E.2d 891 (1939).

In any event, no evidence or authorities have been offered (other than to demonstrate that the appropriation is a lump sum), to show the unconstitutionality of the appropriation and/or the alleged violations of the plaintiffs' Fifth and Fourteenth Amendments rights.

Accordingly the constitutional claims of the plaintiffs are dismissed.

Let this opinion stand for our findings of fact and conclusions of law. Settle order on notice.