HART AND MILLER ISLANDS AREA ENVIRONMENTAL GROUP, INC., and Honorable Clarence Long, M.C. and Honorable Norman R. Stone and Maryland Wildlife Federation, Inc. and John Henderson and Howard Sappington and George Wohlleben and Robert Scott and Margaret Caldwell and Charles Justice

v.

The CORPS OF ENGINEERS OF the UNITED STATES and Honorable Clifford L. Alexander, Secretary of the Army and Lt. Gen. John W. Morris, Chief of Engineers of the United States Army and Col. G. K. Withers, District Engineer, Baltimore District, U. S. Army Corps of Engineers, State of Maryland, ex rel. Francis B. Burch, Attorney General of Maryland.

Civ. No. HM77–973.

United States District Court,
D. Maryland.

Oct. 20, 1978.

Edward B. Rybczynski and Ralph K. Rothwell, Jr., Baltimore, Md., for plaintiff.

Russell T. Baker, Jr., U. S. Atty., D. of Md., and Edward M. Norton, Jr., Asst. U. S. Atty., Baltimore, Md., John E. Varnum, Atty., Dept. of Justice, Washington, D. C., for defendants, The Corps of Engineers and The Secretary of the Army.

Michael B. Hare, Baltimore, Md., for defendant The Baltimore Dist. of the Corps of Engineers.

A. Adgate Duer, Baltimore, Md., for defendant Steamship Trade Ass'n of Baltimore, Inc.

Francis B. Burch, Atty. Gen., State of Md., Baltimore, Md., Warren K. Rich, Asst. Atty. Gen., Dept. of Natural Resources of State of Md., Annapolis, Md., Robert B. Harrison, III, Asst. Atty. Gen., Maryland Port Administration, Baltimore, Md., for State of Md.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

On June 30, 1977, a number of environmental groups and interested individuals filed suit against the Corps of Engineers (hereinafter the Corps), seeking in an eleven count complaint relief from the issuance of a permit by the Corps to the State of Maryland for the construction of a dike and disposal area in the Chesapeake Bay. On October 10, 1977, this court granted the motions of the State of Maryland and the Steamship Trade Association of Baltimore, Inc. to intervene as defendants in this action. Since that time, all parties have engaged in extensive discovery and on May 31, 1978 all parties filed cross motions for summary judgment. The motions for summary judgment were the subject of oral argument on June 21, 1978 and it is the purpose of this memorandum and order to rule on these motions.

*Background*

On February 23, 1972, the State of Maryland, through its Department of General Services, filed an application with the Corps for a permit under the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.,* (sometimes herein referred to as the Act) and Section 404 of the Federal Water Pollution Control Act Amendments of 1972, as amended, 33 U.S.C. § 1344, to construct a dike and dredged spoil disposal facility at Hart and Miller Islands in the Chesapeake Bay. The stated purpose of the dike and disposal area is to contain approximately fifty-two million cubic yards of dredge spoil to be removed from the Baltimore Harbor and its channel approaches.

Hart and Miller Islands are located within Chesapeake Bay approximately thirteen miles east of Baltimore, Maryland. The dike and containment area is to be constructed on the bayward (eastern) side of Hart and Miller Islands about one mile from the mainland and will occupy an area of 1,100 acres or approximately two square miles. The dike itself is to be constructed with sand which will be dredged from deposits within the disposal area. Construction is estimated to take two years.

When the dike is completed, its walls will stand eighteen feet above mean low water, somewhat higher than the current maximum elevations of Hart and Miller Islands which are 5.5 feet and 2.3 feet, respectively. However, only twelve percent of Hart Island and fifty-two percent of Miller Island will be covered by the disposal area. Basically, the disposal area will be rectangular in shape with the islands fitting in to the northwestern, longer side of the area and the structure occupying principally an area to the southeast of the islands.

Dredged spoil will be transported to the disposal area by pumping the material through hydraulic pipelines either from the dredging sites in the Baltimore Harbor or from barges which will carry the dredged spoil from the dredging site to the disposal area. The dredged material will be pumped into the diked containment area and the sand walls of the dike will allow the water to percolate out of the containment area, leaving only the dredged material inside of the containment area. Once the area has been completely filled with dredged spoil, the entire area will be at the height of eighteen feet above mean low water. As a means of protection against erosion on the bayward side of the structure, this side will be rip-rapped with stone, all other sides consisting of the sand constructed walls of the dike.

At present, the expected life of the containment area is uncertain. If the area is used only for the disposal of dredging spoil from maintenance dredging of the Baltimore Harbor and other shipping channels, the expected life of the area is twenty to thirty years. If the area is used to accommodate dredged material from the Baltimore Harbor Channel project, its life expectancy is ten years. The Baltimore Harbor Channel project is a project to deepen the Harbor and its channel approaches from the present depth of thirty-nine to forty-two feet to a depth of fifty feet in order to allow the entry of larger cargo vessels. Congress has authorized the funds for this project (Public Law 91–611) provided the State of Maryland furnishes a disposal site for the dredged spoil from the project. It is estimated that the total dredged spoil from the project will amount to one hundred million cubic yards thus indicating that the Hart and Miller Islands project will accommodate, at best, only fifty percent of this spoil.

After the filing of the application for a permit by the State of Maryland in February of 1972, the Corps began its consideration of the application with the permit finally being issued to the State on November 22, 1976. After initial review of the application, the Corps held a public hearing on August 29, 1972 and in February 1973, the Corps completed its draft environmental impact statement. The initial evaluation of the application occurred in a report dated July 18, 1974 prepared by the District Engineer of the Baltimore District. A second public hearing was held on May 10, 1975 after the Corps had conducted addi-

tional water quality analyses required under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* The Corps' final environmental impact statement was completed in early 1976, this report being required pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* Upon completion of the impact statement, the District Engineer for the Baltimore District prepared a report on the application recommending issuance of the permit with the inclusion of certain conditions in the permit. This recommendation was concurred in by the Corps' North Atlantic Division on March 8, 1976 and the final report was sent to the Corps' headquarters in Washington for the final approval. Final approval was given in November 1976 and the State of Maryland was issued a permit for the diked disposal facility under 33 U.S.C. §§ 403 and 1344.

The administrative record of the Corps' consideration of the permit application is described in the Government's Index to the Administrative Record filed with this court. However, the parties have agreed that the entire administrative record need not be filed and the parties have submitted those documents which they feel bear on the issues raised in the motions for summary judgment as exhibits to their motions. The court is at liberty to request that any additional documents be supplied should the court feel the need to examine additional documents in conjunction with the instant motions.

The eleven counts of plaintiffs' complaint cover numerous allegations having to do with the authority of the Corps to issue the permit and the administrative process undertaken by the Corps in determining that the permit should be granted. The claims of plaintiffs can be summarized as follows: Count one asserts that the Corps acted improperly in issuing the permit to the State of Maryland under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, in that the particular project which was the subject of the permit could only be issued under Section 9 of the Act, 33 U.S.C. § 401. Section 9 requires that Congressional approval of the project be obtained in addition to the issuance of a permit by the Corps. Plaintiffs assert in Counts two through eight that the Corps failed to evaluate adequately the integrity of the proposed construction project, the alternatives to the proposed structure, the probable adverse and cumulative impacts of the structure in the Hart and Miller Islands vicinity, local zoning and permit restrictions affecting the proposed project, and the monetary costs of the permitted project. Plaintiffs allege that the failure to consider these matters adequately is a violation of the National Environmental Policy Act and the Corps' regulations. Counts nine through eleven contain claims that the Corps acted arbitrarily, capriciously and in bad faith with respect to the environmental impact statement and the decision to grant the permit to the State.

## I. The Rivers and Harbors Act of 1899

The application of the State of Maryland for a permit to construct the diked disposal area at Hart and Miller Islands was filed and processed by the Corps under Section 10[1] of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. Plaintiffs contend that the permit can be issued only under the author-

---

1. Section 10 of the Act provides:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

ity of Section 9 [2] of the Act, 33 U.S.C. § 401, because the permit authorizes the construction of one or more dikes in navigable waters of the United States. In turn, plaintiffs assert that Section 9 requires Congressional authorization of the project and, as this has not been obtained, the permit is void as an overstepping of authority by the Corps. Defendants counter with the assertion that issuance of the permit pursuant to Section 10 of the Act was appropriate as that section does not require Congressional consent for the deposit of fill material or construction of certain structures such as breakwaters, bulkheads and jetties in the navigable waters of the United States. Thus, the primary legal issue raised in the cross motions for summary judgment is whether the Corps has authority to permit the construction by the State of Maryland of a diked spoil disposal facility in navigable waters of the United States by its action of issuing the permit on November 22, 1976.

All parties are agreed that the Chesapeake Bay, the body of water in which the proposed construction is to take place, is a navigable body of water. Further, the parties are agreed that the navigable portions of the Bay do not lie wholly within the limits of one state; rather, the Bay is shared by the State of Maryland and the Commonwealth of Virginia. Additionally, defendants have conceded that Congressional authorization of the project pursuant to Section 9 was not sought because of the position that such authorization was not required. It appears that what does remain for resolution on the issue of whether Section 9 is the appropriate section under which the diked disposal facility should be authorized are: (1) the question of whether the proposed facility in this case is a dike within the meaning of Section 9 (or whether portions of the facility come within the classification of a dike), and (2) the question of whether the dike, if one is found to be contemplated, is to be placed "over or in any . . . navigable water of the United States."

The parties have presented many and varied arguments on the interpretations of Section 9 which they seek to have the court adopt. In order to respond to these arguments, the court has attempted to categorize these arguments in the following manner: (1) reported case law on the interpretation of Section 9, (2) history of Section 9 and Section 10, and (3) the Corps' past administrative practice with respect to the application of Sections 9 and 10.

*The Reported Case Law*

Turning first to the cases, the parties are in dispute over the applicability of cases which reach conflicting conclusions in interpreting Section 9 generally and particularly the term "dike." The court has been cited to two district court decisions which appear to give conflicting definitions of the term "dike." *Citizens Committee for the Hudson Valley v. Volpe,* 302 F.Supp. 1083 (S.D.N.Y. 1969), *affirmed,* 425 F.2d 97 (2nd Cir. 1970); *Petterson v. Resor,* 331 F.Supp. 1302 (D.C. Oregon 1971), *remanded as moot,* 494 F.2d 124 (9th Cir. 1974).

2. Section 9 of the Act provides:

It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army.

In *Citizens Committee for the Hudson Valley,* the Corps had issued a permit to the State of New York which permitted a fill operation for the purpose of constructing the Hudson River Expressway. The permit had been issued pursuant to Section 10 of the Rivers and Harbors Act of 1899. The expressway was planned to extend approximately nine miles along the eastern shore of the Hudson River. Some 22,000 feet of the highway were to rest on 9,500,000 cubic yards of fill which would extend at its widest point some 1,300 feet into the river. The district court noted that the main issue between the parties was whether Section 9 should apply to the project, with plaintiffs contending that since the project involved dikes, causeways and bridges to be built in or over navigable waters of the United States, the Corps had exceeded its authority in issuing the permit pursuant to Section 10. In determining whether a dike was involved in the project, the court examined the permit itself, as well as the plans for the project, and found both to contain numerous references to "dikes." The district court also noted that the plans prepared in connection with the securing of bids on the project illustrated and described various types of dikes to be included in the project. Defendants in that case countered with the argument that even if dikes were involved, Section 9 would not apply as the dikes would not have a substantial effect on navigation. Further, defendants argued that Congress meant the term "dike" in the Act of 1899 to be given the meaning stated in Chambers Technical Dictionary, p. 273 (3rd Rev. ed. with Supp.1958) which was as follows: "a wall or embankment of timber, stone, concrete, fascines, or other material, built as a training works for a river so as rigidly to confine flow within definite limits over the length treated." From this definition, the defendants supported their argument that a dike must substantially affect navigation before it will be one included within the meaning of that term in Section 9. The district court concluded that dikes were contemplated in the project and that said dikes came within the meaning of the term as used in Section 9:

We hold, based on the evidence presented at trial, that 'dikes,' characterized as such by the defendants, are to be constructed along the western side of the fill and that Congress when it said 'any dike' over or in any navigable river meant exactly that. Therefore, the Corps of Engineers exceeded its statutory authority in issuing the permit which enables the State to commence advertising for bids.

In the absence of any legislative or judicial authority to support the defendants' theory of statutory interpretation we apply the ordinary meaning to the term 'any dike.' Dike is defined as '[a] bank, as of earth, thrown up to form a barrier, line of demarcation or the like * * *.' Webster's New International Dictionary, 2d Ed., p. 730 (1954); 'An embankment for controlling or holding back the waters of the sea or a river.' Random House Dictionary of the English Language, p. 403 (1967). 'Statutes are to be construed by attributing its ordinary meaning to the language used.' . . . Consequently, we hold that if Congress meant to confine its jurisdiction to only those dikes that substantially affect navigation, it would have said so. Since proposed dikes are involved and will be 'over or in' a navigable river of the United States, we leave to Congress, when it decides if it will approve the project, the consideration of the effect of the dikes on navigation. (citation omitted) 302 F.Supp. at 1088–1089.

On appeal, the Second Circuit Court of Appeals briefly discussed the merits of the case and adopted the conclusions of the district court with respect to the definition of the term dike:

. . . [t]he district court concluded that construction of both a 'dike' and a 'causeway' were contemplated by the State. The court was called upon to construe the meaning of those terms as they were used in § 401 of the Rivers and Harbors Act of 1899, and as they applied in fact to the Expressway plans before it. Having carefully reviewed the pertinent

evidence and considered the governing rules of statutory construction, we adopt the conclusion of the district court that the word 'dike' used by the defendants in their permit has the same meaning there as in § 401 of the Act, and that construction of a dike is forbidden by that Section without the consent of Congress. 425 F.2d at 106.

In *Petterson v. Resor, supra,* the district court determined that the approach of the court in *Citizens Committee for the Hudson Valley* of using the common dictionary definition of the term "dike" was inappropriate in view of the legislative history of Sections 9 and 10 and the administrative practice of the Corps. That case involved a permit issued by the Corps under Section 10 for the extension and relocation of an airport runway. Said extension was to occur on a fill to be constructed in the South Slough of the Columbia River. The construction of the fill involved the removal of all or portions of three islands by dredging and the placing of the dredged material in the fill area. The court noted: "These improvements will not affect the main channel or the navigability of the Columbia River which flows between Oregon and Washington. In fact, the improvements will increase the navigability of the river." 331 F.Supp. at 1303. Although the court apparently relied upon the legislative history of Sections 9 and 10, the court does not indicate exactly which portions of the history were relied upon and does not specifically refer to any particular documents, Congressional or otherwise. The court merely states:

Here, defendants presented the evidence of legislative history and consistent administrative practice which was not before the court in *Hudson Valley.* This evidence supports the defendants' contention that § 401 requires *Congressional consent for dikes only when they are obstructions to navigation.* . . .

The legislative history shows that Congress enacted the Rivers and Harbors Appropriation Act of 1899, Ch. 425, 30 Stat. 1121, as a comprehensive plan for keeping our interstate waterways clear of unreasonable obstructions and structures. It required approval of the federal government for work on *navigable interstate waterways.* Every structure built in a *navigable waterway* required the approval of the Chief of Engineers and the Secretary of the War (now the Secretary of the Army). In addition, for those structures like bridges, dams and dikes, usually larger structures, which are placed across a river and which constitute an obstruction to navigation, Congressional consent was required. This distinction was written into the law, apparently because of the belief that Congress could not constitutionally delegate to the Secretary of War or to any other agency the authority to permit an obstruction of a navigable waterway. *United States v. Keokuk & H. Bridge Co.,* 45 F. 178 (S.D. Iowa 1891). (emphasis supplied) 331 F.Supp. at 1306.

Additionally, the court looked to various examples of other projects which had been permitted by the Corps under Section 10 and which were projects involving the extension of airport runways. The court found that the mere designation of a project as a "dike" was not determinative "if the proposed improvement did not obstruct navigation." 331 F.Supp. at 1306.

On appeal, *Petterson* was remanded to the district court to vacate the previous judgment and to enter a judgment of dismissal of the action as moot. 494 F.2d 124 (9th Cir. 1974) Plaintiffs argue that the entry of a judgment of dismissal as moot relegates the opinion of the district court to an advisory status because the term "moot" indicates that the point remains undecided. Because the jurisdiction of the federal courts requires that a case or controversy exist in fact, it has been the practice of the Supreme Court in a case which has become moot pending final decision to remand with directions to dismiss the action. *See United States v. Munsingwear,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). The rationale of this procedure applies with equal force to a remand from a court of appeals with directions to dismiss and was aptly stated by the Supreme Court as follows:

That procedure clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary. 340 U.S. at 40, 71 S.Ct. at 107.

Thus, the decision in *Petterson* must be viewed by this court as a preliminary decision which has not undergone the review sought by the side losing the case in the district court. As such, this court will consider the opinion as carrying only advisory weight on the issues presented in the instant action.

The court also notes that if it were to accept the reasoning of the district court's opinion in *Petterson,* that case is clearly distinguishable on the facts as the district court stated that the improvements to the airport in that case in no way obstructed navigation on the Columbia River but rather would enhance such navigation, apparently because all or portions of three small islands in the river were to be removed by dredging to construct fill for a runway extension. In the present case it cannot be said that the dike and the large impoundment area in the bay created by it will enhance the navigability of the bay.

The court has been cited to an additional case which dealt with the application of Section 9 to a structure deemed to be a dike within the meaning of that section. *Sierra Club v. Morton,* 400 F.Supp. 610 (N.D.Calif. 1975). In the *Sierra Club* case a canal was to be built which would result in the damning of the river at the point where the canal would cross the river. The court adopted the reasoning of *Citizens Committee for the Hudson Valley* in applying the ordinary meaning of the words "dike" and "dam" and in finding that a structure covered by Section 9 was involved. The court noted:

> Such a closure of the Middle River will constitute the building of a 'dike' within the meaning of Section 9. In *Citizens Committee for the Hudson Valley v. Volpe,* . . . , the court held that the

word 'dike' should be defined in accordance with its ordinary meaning. The court found that dike meant, *inter alia,* '[a]n embankment for controlling or holding back the waters of the sea or a river.' . . . The Court notes that 'dam' is defined as 'a barrier preventing the flow of water'. . . . Hence, even though the closure of Middle River will be caused by a structure denoted as a 'canal', because the structure will have the effect of a 'dam' or 'dike', the Court finds that the Peripheral Canal is the type of structure regulated by Section 9. Because the Peripheral Canal will clearly be 'in' the Middle River, the only issue remaining is whether Section 9 prohibits any dikes or only those dikes which obstruct navigation. Although the legislative intent underlying the enactment of Section 9 may well have been to prohibit unreasonable obstructions to navigable waters, it seems likely that Congress used the word 'any' in Section 9 in order to reserve the right to determine whether a given structure created an unreasonable obstruction. Because the Peripheral Canal will obstruct navigation on the Middle River, however, either construction of Section 9 will include the Canal within the section's regulatory prohibitions. (citations omitted) 400 F.Supp. at 626–627.

It would appear that the court in *Sierra Club* recognized the possibility that a two step process would have to be undertaken in a Section 9 inquiry: (1) does the structure fall within the ordinary definition to be given to the term "dam" or "dike", and (2) does this "dam" or "dike" obstruct navigation. The court found the consent of Congress was required because the court considered that either (1) the structure was a dam or dike, or (2) the structure was a dam or dike and was an obstruction to navigation. The court in *Sierra Club* did not make a finding as to whether the structure was an *unreasonable* obstruction to navigation, an inquiry the court thought the statute reserved to the Congress.

To summarize the three cases discussed above, *Citizens Committee for the Hudson*

*Valley* found that Section 9 applies to any structure coming within the ordinary meaning of the word "dike" and left to Congress the determination of whether there was an obstruction to navigation, unreasonable or not. *Petterson* is an advisory view that Congressional consent is required only when a dike is an obstruction to navigation, while *Sierra Club* accepted the premise that the ordinary meaning should be given to the term "dike" and did not decide whether Section 9 applied to *any* dike or only those which constituted an obstruction to navigation, finding that either construction of Section 9 applied in that case as the structure contemplated was a dike and was an obstruction to navigation.

Two decisions of the Supreme Court support the court's view that Congress has specified the structures over which it retains control, that a dike is one such structure, and that the general purpose of Section 9 was to exercise control over obstructions to navigation, leaving to Congress the determination of which obstructions will be allowed and which prohibited. This determination is delegated to the Corps of Engineers as to cases enumerated in the second and third clauses of Section 10 but is reserved to the Congress as to those structures described in Section 9.

Thus, in *Wisconsin v. Illinois,* 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929), the court speaking through Chief Justice Taft stated:

> Congress, having stated in section 9 as to what particular structures its specific consent should be required, intended to leave to the Secretary of War, acting on the recommendation of the Chief of Engineers, the determination of what should be approved and authorized in the classes of cases described in the second and third clauses of section 10. If the section were construed to require a special authorization by Congress whenever in any aspect it might be considered that there was an obstruction to navigable capacity, none of the undertakings specifically provided for in the second and third clauses of section 10 could safely be undertaken without a special authorization of Congress. We do not think this was intended . . .
>
> *　 *　 *　 *　 *　 *
>
> The true intent of the act of Congress was that unreasonable obstructions to navigation and navigable capacity were to be prohibited, and, in the cases described in the second and third clauses of Section 10, the Secretary of War, acting on the recommendation of the Chief of Engineers, was authorized to determine what in the particular cases constituted an unreasonable obstruction.
>
> *Id.* at pp. 412–413, 49 S.Ct. at p. 170

In *United States v. Arizona,* 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935), the court dealing with Section 9 stated:

> Subject to an exception with which we have no concern, sec. 9 of the Act of March 3, 1899, forbids the construction of any bridge, dam, dike or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress shall have been obtained and until the plans shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War. 33 U.S.C. Sec. 401. And sec. 12, as amended, makes violations of section 9 punishable by fine or imprisonment or both and provides for removal of unauthorized structures. 33 U.S.C. Sec. 406. These provisions unmistakably disclose definite intention on the part of Congress effectively to safeguard rivers and other navigable waters against the unauthorized erection therein of dams or other structures for any purpose whatsoever.
>
> *Id.* at pp. 183–184, 55 S.Ct. at p. 669

■ In the light of this review of cases construing the Act, the court in the present case concludes that it should first determine whether the proposed structure is a dike within the ordinary meaning of the term. If the structure is found to come within this meaning, the court should then consider whether the dike, if constructed, would constitute an obstruction to navigation. If the structure is found to be a dike which is an obstruction to navigation, it then becomes

the exclusive province of the Congress to determine whether the obstruction is unreasonable and approval of the project should be denied, or whether the obstruction is reasonable and approval should be granted.

### Is the Structure a Dike?

*Citizens Committee for the Hudson Valley v. Volpe,* 302 F.Supp. 1083 (S.D.N.Y. 1969) teaches that the word "dike" is to be given its ordinary meaning in construing Section 9. Dike is defined as "[a] bank, as of earth, thrown up to form a barrier, line of demarcation or the like * * *" Webster's New International Dictionary, 2nd Ed., p. 730 (1954). "An embankment for controlling or holding back the waters of the sea or a river." Random House Dictionary of the English Language, p. 403 (1967).

■ The State of Maryland in its application for a permit (A.R.D. 11)[3] stated "We request a permit for the construction of a diked disposal area for the dredged spoil to be built as shown on the attached plans in the Chesapeake Bay in the vicinity of Hart and Miller Islands." The permit finally issued on November 22, 1976 (Exhibit 1 to the Complaint) authorizes the State of Maryland to construct "a diked disposal area to contain dredged material on approximately 1,100 acres adjacent to Hart and Miller Islands" in accordance with attached plans and drawings titled "Proposed Dredging and Dike in Chesapeake Bay at Miller and Hart Islands." The area plan attached to the permit notes that "4,300,000 cubic yards will be dredged from portions of cross-hatched area by hydraulic dredging and will be deposited around perimeter of disposal area to form the dike"; "during construction of the dike, the rip-rap will be placed in a timely manner to preclude erosion of the dike material"; "in order to shape the dike, dragline method may be used." The project description in the final environmental impact statement prepared by the U.S. Army Engineer District, Baltimore, Maryland refers to the structure as a dike throughout. The communications to and from the Corps of Engineers found in the administrative record with regard to the project are replete with references to the structure as a dike. Since the whole purpose of the structure is to hold back the waters of the bay from intrusion into the area in which the dredged spoil will be placed, the court is satisfied that the structure is a dike within the ordinary meaning of that term.

### Is the Dike an Obstruction to Navigation?

The structure of Sections 9 and 10 of the Rivers and Harbors Act of 1899 is not simple. Justice Harlan has stated that their provisions are complex and their legislative history tortuous.[4] Curiously, the word "obstruction" appears only once, in the first clause of Section 10. It appears to the court that the first clause of Section 10 is a transitional clause, and applies not only to Section 10, but to Section 9.

This conclusion stems from a review of the principal clauses in the two sections.

*First* Section 9, 33 U.S.C. Section 401, makes it unlawful to construct any bridge, dam, dike, or causeway without the consent of Congress and the approval of the Chief of Engineers and the Secretary of War.

*Second* A bridge, dam, dike or causeway under Section 9 may be built under authority of a state legislature where the waterway involved lies wholly within the limits of the state, provided the location and plans are approved by the Chief of Engineers and the Secretary of War.

*Third* Clause 1 of Section 10, 33 U.S.C. § 403 provides "That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any waters of the United States is hereby prohibited."

*Fourth* Clause 2 of Section 10 makes it unlawful to build any wharf, pier, dol-

---

**3.** "A.R.D." refers to Administrative Record Document.

**4.** Dissenting in *United States v. Republic Steel Corp.,* 362 U.S. 482, 493, 80 S.Ct. 884, 4 L.Ed.2d 903.

phin, boom, weir, breakwater, bulkhead, jetty, or other structure except on plans recommended by the Chief of Engineers and authorized by the Secretary of War.

*Fifth* Clause 3 of Section 10 makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War.

What emerges from these clauses seems to be this:

1. Any obstruction to navigable capacity not authorized by Congress is prohibited.

2. Bridges, dams, dikes and causeways are obstructions to navigation where the consent of Congress is absolutely required if the navigable water extends through more than one state.

3. Congress has delegated its consent function in the case of a bridge, dam, dike or causeway obstructing a navigable water wholly within a single state to the Chief of Engineers and the Secretary of War if the concerned State has authorized it.

4. Congress has delegated its consent function as to any of the obstructions enumerated in Clauses 2 and 3 of Section 10 to the Chief of Engineers and the Secretary of War.

The Supreme Court has ruled that the "any obstruction" language of Section 10, Clause 1 is not limited either to the specific structures enumerated in Section 9 or to the specific structures listed in Clauses 2 and 3 of Section 10. Justice Douglas in *United States Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, rehearing denied, 363 U.S. 858, 80 S.Ct. 1605, 4 L.Ed.2d 1739, observed that the "any obstruction" language of Section 10 must be given a broad sweep, embracing not only the prior enumeration of obstructions in Section 9, the structures listed in Clauses 2 and 3 of Section 10, but also diminution of the navigable

capacity of a waterway by means not included in any listing of structures in Section 9 or Section 10. In the *Republic* case, he held the concept of "obstruction" was therefore broad enough to encompass the discharge into a navigable river of industrial solids which reduce the depth of the channel.

█ In the present case, we are dealing with a massive structure two square miles in size in the Chesapeake Bay, a mile off the shore. It would eventually accommodate 52 million cubic yards of spoil. According to the environmental impact statement itself [5], "it is undeniable that boating will be precluded in the space occupied by the containment area. On the Bay side boating will be moved further out into the Bay." The court finds that such a structure in the waters of the bay would be an obstruction to navigation. Whether or not it is an unreasonable obstruction is a matter that should be determined by the Congress under 33 U.S.C. § 401.

### The Reach of the Statute

Defendants contend that 33 U.S.C. § 401 is limited in its application to those situations where a dam or dike is constructed *across* a navigable water of the United States, thereby creating an obstacle to navigation of the waterbody. 33 U.S.C. § 403 is said on the other hand to apply to all other structures to be constructed in navigable waters. From this it is argued that since Maryland's diked disposal facility, although called a "dike", does not extend completely across the Chesapeake Bay, it therefore is subject to regulation under 33 U.S.C. § 403, rather than 33 U.S.C. § 401. Indeed, the Corps has been careful to announce this distinction in the latest regulations promulgated on July 19, 1977, after the filing of the present suit. Those regulations now define the term "dike" to mean:

an embankment, low dividing wall, or other protective barrier that completely spans a navigable water of the United States and that may obstruct interstate waterborne commerce.
33 C.F.R. 321.2

5. EIS, p. 90.

It is said by defendant Corps that the new regulation merely crystalizes what has been a uniform administrative practice; namely, to treat structures which completely obstruct a waterway under Section 401 and all others under Section 403. It is urged further that where an agency has interpreted a statute which it has been charged to administer, the court should grant that agency's construction considerable deference.

■ As to these contentions, the court observes that water cannot rise higher than its source—in this instance neither administrative practice nor the promulgation of regulations can create jurisdiction where none exists. As the Supreme Court put it in *Federal Maritime Commission v. Seatrain Line,* 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620:

> But the Commission contends that since it is charged with administration of the statutory scheme, its construction of the statute over an extended period should be given great weight. *See, e. g., N.L.R.B. v. Hearst Publications, Inc.,* 322 U.S. 111, [64 S.Ct. 851, 88 L.Ed. 1170] (1944). This proposition may, as a general matter, be conceded, although it must be tempered with the caveat that an agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate.
> *Id.* at 745, 93 S.Ct. at 1785

■ In the present case, the newly promulgated definition of the term "dike" was not contained in the Corps' regulations at the time the Hart-Miller permit was being processed and issued. (33 C.F.R. 209.125, 1976 Ed.). The regulation cannot by definition expand the reach of the statute. The statute does not say the consent of Congress is required only when the bridge, dam or dike completely spans or completely obstructs a waterway. The statute in relevant part expressly states:

> It shall not be lawful to construct . . any bridge, dam, dike, or causeway over or *in* any . . . navigable water . . . until the consent of Congress to the building of such structures shall have been obtained. (Emphasis supplied)

The language is "over or in" any navigable water—not "completely spans."

It is significant that in the case which is closest to this case on its facts—*Citizens Committee for the Hudson Valley v. Volpe, supra*—the dike in issue there extended north along the east side of the Hudson River, containing fill to support a highway extension. It did not in any fashion "completely span" the Hudson River or completely obstruct waterborne commerce. The court found it unnecessary to consider the effect of the dike on navigation—a task reserved to the Congress under the statute. However, if such consideration were necessary, the court noted that the dike would affect the flow of the river by preventing erosion of the fill back to a natural shoreline (302 F.Supp. 1089). This same reasoning would be applicable to the Hart-Miller Dike, which involves over five times as much fill as the Hudson River Project.

The Corps argues that because there have been instances where it has interpreted the statute to give it control over dike structures which do not completely obstruct navigation, and Congress has not acted to reverse the Corps action, Congress must be considered to have tacitly ratified the Corps' administrative interpretation of the statute. Disproving this argument is the fact that when necessary Congress has specifically exempted diked disposal areas from the application of Section 401, thus indicating either that Congress is not aware of or does not accept the Corps' interpretation of Section 401. In this connection, reference is made to the Rivers and Harbors Act of 1970, Public Law 91–611, December 31, 1970, wherein the Congress, in a section of the Act dealing only with the Great Lakes and their connecting channels, specifically provided:

> Sec. 123(a) The Secretary of the Army, acting through the Chief of Engineers, is authorized to construct, operate, and maintain, subject to the provisions of subsection (c), contained spoil disposal facilities of sufficient capacity for a period not to exceed ten years, to meet the require-

ments of this section. Before establishing each such facility, the Secretary of the Army shall obtain the concurrence of appropriate local governments and shall consider the views and recommendations of the Administrator of the Environmental Protection Agency and shall comply with requirements of Section 21 of the Federal Water Pollution Control Act, and of the National Environmental Policy Act of 1969. *Section 9 of the River and Harbor Act of 1899 shall not apply to any facility authorized by this section.* (emphasis supplied)

Here is a clear indication of Congress specifically waiving its prerogative under 33 U.S.C. § 401 to approve the very type of facility involved in the present case. If, as the Corps contends, the Congress had tacitly ratified the administrative interpretation argued for in the present case, there would have been no need to spell out a specific exemption in the Rivers and Harbors Act of 1970, Public Law 91–611. It is to be noted Public Law 91–611 is the same Act cited by the Corps as authorizing funds to deepen Baltimore Harbor and its access channels to a depth of 50 feet, conditioned upon the requirement that the State of Maryland provide disposal sites for the dredged spoil.

### Conclusion

While the court is keenly aware of the problems associated with open water dumping of dredge spoil, and of the need to deepen Baltimore Harbor and its access channels, the statute mandates Congressional approval of the project before it can be undertaken. The court, therefore, holds that in issuing a permit to the State of Maryland under 33 U.S.C. § 403, the Corps of Engineers exceeded its authority. On the one issue dealt with here—the legality *vel non* of the permit to construct the diked dredge spoil containment area at Hart and Miller Islands—the court hereby grants the plaintiff's motion for summary judgment and denies the motions for summary judgment filed by the defendants. The court expresses no view on the other issues raised in the cross motions for summary judgment.